[Civ. No. 57321. Second Dist., Div. Two. Dec. 9, 1981.]

THE PEOPLE ex rel. GEORGE DEUKMEJIAN,
as Attorney General, etc., Plaintiff and Respondent, v.
WORLDWIDE CHURCH OF GOD, INC., et al., Defendants and
Respondents;
HILLEL CHODOS et al., Real Parties in Interest and Appellants.

548

COUNSEL

Hillel Chodos, in pro. per., for Real Parties in Interest and Appellants.

George Deukmejian, Attorney General, James M. Cordi, Deputy Attorney General, for Plaintiff and Respondent.

Ervin, Cohen & Jessup, Allan Browne, Lawrence H. Tribe, Allan B. Cooper, George Schivaelli, Allan Gabriel, Horvitz, Greines & Poster, Horvitz & Greines, Ellis J. Horvitz, Alan G. Martin, Marc J. Poster and David H. Remes for Defendants and Respondents.

OPINION

**COMPTON, J.**—California attorneys, Hillel Chodos, Rafael Chodos, Hugh John Gibson, and the New Jersey law firm of Cohn & Lifland,[1] appeal from an order of the superior court denying their application for $100,000 in attorneys' fees for services rendered in procuring and defending the appointment of a receiver in an action against respondents, the Worldwide Church of God (Church).[2] We affirm.

As we will discuss, *infra*, the receivership has long since been dissolved and the underlying action has been dismissed without any determination that respondents were guilty of any wrongdoing.

In the summer of 1978, certain members of the Church contacted the New Jersey law firm of Cohn & Lifland expressing their concern that officials of their Church[3] might be guilty of malfeasance and misfeasance with respect to Church affairs. Hillel Chodos was contacted by the New Jersey firm for assistance.

Chodos, determining that the complaining Church members had no standing to sue, brought the matter to the attention of Deputy Attorney General Lawrence Tapper, whose duties included surveillance of charitable trusts. Chodos recommended that orders be obtained compelling the Church to account for its assets and to select new and independent trustees or directors. He also suggested that a receiver pendente lite be appointed to conserve the assets.

---

[1] Hereafter, reference to Attorney Chodos will include all appellants.

[2] The Worldwide Church of God and its various component institutions will be collectively referred to as the Church. The Worldwide Church of God was founded 45 years ago. It is an evangelical Christian church based upon fundamental teachings of both the Old and New Testaments of the Bible. It is an hierarchically structured organization incorporated under the California General Nonprofit Corporation Law and is headquartered in Pasadena, California. Its related institutions engage in a number of religious, social and cultural activities including the publication and distribution of a number of periodicals on a worldwide basis.

[3] The two officers who were the primary focus of this complaint were Herbert W. Armstrong, Jr., and Stanley R. Rader. Armstrong is the founder of the Church, its Pastor General and according to the doctrine of the Church, Christ's Apostle and Ambassador, the spiritual and temporal leader of the church. Stanley R. Rader, an attorney, and certified public accountant, became associated with the Church in a business capacity in 1957, but later in 1975, embraced the Church,. was baptized and became an officer of the Church. He, for many years, has been Mr. Armstrong's personal adviser, and became a minister of the Church in 1979.

Deputy Attorney General Tapper apparently believing that his authority in supervising the administration of charitable trusts in California included the authority to take the rather drastic action suggested even in a case of an admittedly hierarchal church organization, undertook to deputize Chodos as a special deputy attorney general.

From that point forward, Chodos and Deputy Attorney General Tapper consistently asserted that Chodos represented the People of the State of California and no other client. In fact, it seems unlikely that the broad and pervasive authority which was later to be granted to the receiver would have been so granted had Chodos not enjoyed that status. The arrangement between Tapper and Chodos, however, was that Chodos' compensation, if any, would come from Church funds.

In fairness to Mr. Chodos and Mr. Tapper, they at all times eschewed any desire to interfere with the ecclesiastical phase of the Church's operation and sought only, in their words, to examine the financial aspects of the Church in order to insure that money contributed to the Church was in fact used for "God's work." They asserted that the Church's property, assets and records were "public" and that they were always and ultimately in the custody of and subject to the supervision of the courts upon application of the Attorney General.

To state the proposition is to expose its conflict with the constitutional prohibition against the governmental establishment or interference with the free exercise of religion. How the state, whether acting through the Attorney General or the courts, can control church property and the receipt and expenditure of church funds without necessarily becoming involved in the ecclesiastical functions of the church is difficult to conceive.[4]

---

[4]For example, after the receivership was in place, Herbert Armstrong attempted to mail a letter to approximately 60,000 Church members, in which he described the action against the Church and the appointment of the receiver and strenuously objected thereto on spiritual and legal grounds. He asked the membership to make a special offering directly to him as an indorsement of his stewardship to enable him to defend the Church. The receiver, with court approval, contacted the post office, intercepted the letter and prevented the mailing. Subsequently the receiver sent a telegram to all ministers of the Church, decreeing that members were not permitted to make contributions to Mr. Armstrong or his representative for Church purposes or on behalf of the Church.

On January 2, 1979, Chodos, along with retired Superior Court Judge Steven Weisman, and Deputy Attorney General Tapper appeared ex parte before Superior Court Judge Jerry Pacht and urged Judge Pacht to appoint a receiver on the grounds that Church property was being misappropriated and that some Church-owned property in the State of Texas was being sold for approximately $20 million below its true market value. It was further alleged that Church records were being destroyed.

Chodos, with the acquiescence of Deputy Attorney General Tapper, filed a complaint against the Church. The complaint sought to remove the Church directors, appoint new ones, appoint a receiver and other injunctive relief.

Judge Pacht then appointed Judge Weisman receiver of the Church and issued various injunctive orders. Those ex parte orders empowered the receiver "to take possession forthwith of *all* of the funds, assets and property, and *all* of the books and records" of the Church, College and Foundation, and enjoined the defendants and others from interfering with or obstructing the receiver or withholding from him "any of the funds, assets, properties, books or records of the Church."

Acting upon these orders, Judge Weisman as receiver, Chodos as a deputy receiver and various deputy attorneys general personally appeared at the Church unannounced and proceeded to take possession and control of the premises, seizing Church records and even discharging some employees.

On January 4, 1979, the Church moved to vacate the appointment of the receiver. At a hearing before the Honorable Vernon Foster, judge of the superior court, Chodos resigned as a deputy receiver and continued to act in his role as special deputy attorney general. Judge Foster denied the motion to vacate the appointment but temporarily restrained the receiver from interfering in the day-to-day business activities of the Church.

A hearing on confirmation of the receivership pendente lite commenced on January 10, 1979, before the Honorable Julius Title, judge of the superior court. At the close of that hearing, Judge Title found that neither of the original allegations, i.e., sale of Church property at less than market value nor destruction of records was true.

Nevertheless the receivership was continued because of Judge Title's belief that he should do so if there was "some possibility' that a trier of fact might later find misconduct on the part of the directors or trustees of the Church. He issued an order pendente lite directing the receiver to: "(1) take possession and control of the Church, College and Foundation, 'including *all* of its assets, both real and personal, tangible and intangible, of every kind and description, except as is otherwise provided ... (2) 'supervise and control all the business and financial operations of the Church,' and at 'his sole discretion' assume, management and control as he deemed necessary; (3) employ *anyone* he deemed necessary to carry out his duties and pay them out of Church funds; (4) suspend or terminate *any* Church employee, officer or agent 'in his sole discretion,' except for Armstrong and Rader, whom the receiver was authorized to discharge only with prior court approval; (5) bar *any* such officer, employee or agent. from Church grounds and facilities after his suspension or termination; (6) 'take immediate possession of *all* books and records of the Church, no matter where or in whose possession said records may be found. These records are to include without limitation journals, ledgers, bank statements, vouchers, invoices, logs, memoranda, computer-readable data, and *membership lists.* These books and records shall be made available for the use of the employees of the Church in the carrying out of all their duties. They shall also be made available to the representatives of the plaintiffs in this action, for use in preparing for the trial in this action.' (7) determine in his discretion what compensation would be paid to Armstrong and Rader; (8) conduct a thorough audit of the Church, commencing forthwith; (9) review all allegations of malfeasance and neglect concerning the Church's business and financial affairs and apply to the court for relief." (Italics added.)

On February 21, 1979, the Church again moved to vacate the receivership, Judge Title at that point concluded that the only purpose of the receivership was to accomplish an audit or accounting of Church funds. He ordered the receivership suspended and directed that the Attorney General conduct an audit of the Church's financial record at state expense.

This accounting was to be facilitated by an injunction directing that the Church provide the Attorney General with, inter alia, office space, copying machines and "full on line access to all portions of the Church's computerized data base and information on retrieval systems."

In conjunction with the dissolution of the receivership, Judge Title awarded the receiver and his attorney fees in the amount of $250,000 out of Church funds. He denied Chodos an award for his fees.

When the Church noticed an appeal from this injunctive order, as well as the prior receivership orders, Judge Title reimposed the receivership on the grounds that the appeal itself "raised a question as to why they are resisting."

The reimposition of the receivership, however, was stayed pending the appeal when 900 Church members pledged in excess of $3.4 million in security as an undertaking.

On July 7, 1980, the Legislature enacted and the Governor signed Senate Bill No. 1493 repealing Corporations Code section 9230[5] and replacing it with an entirely new but similarly numbered statute.

---

[5]Corporations Code section 9230 formerly read as follows: "(a) Upon reasonable grounds to believe that the following condition or conditions have occurred or do exist, the Attorney General may, at reasonable times, examine a corporation to determine whether: (1) The corporation *fails to qualify as a religious corporation under this part*; or (2) There is or has been any fraudulent activity in connection with the corporation's property; or (3) Any corporate property is or has been improperly diverted for the personal benefit of any person; or (4) Property solicited and received from the general public based on a representation that it would be used for a limited purpose other than general support of the corporation's religious activities, has been improperly used in a manner inconsistent with the stated purpose for which the property was solicited; or (5) There has been a substantial diversion of corporate assets from stated corporate purposes. (b) *Such examination shall respect privileges enumerated in Division 8 (commencing with Section 900) of the Evidence Code and shall protect the confidential nature of membership lists by using such lists only in connection with the examination and any subsequent court proceeding. In addition, such examination shall not unnecessarily interfere with normal operations and religious observances of the corporation.* (c) The Attorney General may institute an action in the name of the state to enforce the right of examination set forth in subdivision (a). (d) For reasonable cause, the Attorney General may institute an action in the name of the state: (1) To establish that the corporation fails to qualify as a religious corporation under this part, and if a court so finds it shall enter an order that the corporation shall no longer operate as a religious corporation under this part. (2) To correct any wrongful activity which has taken place in connection with or as a result of any condition or conditions set forth in paragraph (2), (3), (4) or (5) of subdivision (a)."

The newly enacted section now reads: "(a) Except as the Attorney General is empowered to act in the enforcement of the criminal laws of this state, and except as the Attorney General is expressly empowered by subdivisions (b), (c) and (d), the Attorney General shall have no powers with respect to any corporation incorporated or classified as a religious corporation under or pursuant to this code. (b) The Attorney General shall have authority to institute an action or proceeding under Section 803 of the Code of Civil Procedure, to obtain judicial determination that a corporation is not properly

The preamble to the legislation, after reciting the provisions of the First Amendment of the United States Constitution and article I, section 4 of the California Constitution concerning freedom of religion, reads in part: "The Legislature hereby declares that the power of the State of California with respect to the formation, existence, and operation of religious corporations shall be limited to those expressly provided in statutes duly enacted by the Legislature, and that mere incorporation under the laws of California constitutes no waiver of the fundamental protections afforded religious bodies and individual freedom of worship."

Even though the legislation was not to become effective until June 1, 1981, the Attorney General very wisely viewed that legislation as a declaration of public policy and a legislative objective to prevent the state from engaging in the very type of litigation represented by this case. He thus directed the dismissal of the underlying action.

The Church offered proof, which was substantially uncontroverted, that the receivership had caused the credit position of the Church to be placed in jeopardy for favorable grant of bank loans and the donations and receipts of the Church from the faithful had plummeted from an average of $17 million per month to a mere trickle of revenue. It was stated that this had resulted in the cancellation of various educational and cultural programs, youth activities and public service efforts, all of which impacted unfavorably upon the Church's religious work. Additionally, the seizure of Church records and lists and invasion of the

---

qualified or classified as a religious corporation under the provisions of Section 9111. (c) The Attorney General shall have the authority (1) expressly granted with respect to any subject or matter covered by Sections 9660 to 9690, inclusive; (2) to initiate criminal procedures to prosecute violations of the criminal laws, and upon conviction seek restitution as punishment; and (3) to represent as legal counsel any other agency or department of the State of California expressly empowered to act with respect to the status of religious corporations, or expressly empowered to regulate activities in which religious corporations, as well as other entities, may engage. (d) Where property has been solicited and received from the general public, based on a representation that it would be used for a specific charitable purpose other than general support of the corporation's activities, and has been used in a manner contrary to that specific charitable purpose for which the property was solicited, the Attorney General may institute an action to enforce such charitable trust; provided (1) that before bringing such action the Attorney General shall notify the corporation that an action will be brought unless the corporation takes immediate steps to correct the improper diversion of funds, and (2) that in the event it becomes impractical or impossible for the corporation to devote the property to the specified charitable purpose, then the directors of the corporation may approve in good faith the use of such property for the general purposes of the corporation."

Church's data retrieval system was said to have crippled Church admin-istration and caused a major layoff of Church employees. In summary the Church was severely damaged by the receivership.

It is at once apparent that the termination of the litigation by way of dismissal was favorable to the Church and that the abortive proceedings conferred detriment rather than benefit on the Church.

On appeal, Chodos relies upon certain well recognized exceptions to the general rule that an attorney must look to his client for payment of services. We hasten, however, to point out that Chodos, as a special deputy attorney general, had as a client the People of the State of California. That client pays the Attorney General and his deputies salaries to perform the legal work of the state.

██ While the Attorney General is authorized under certain circum-stances to employ special counsel (Gov. Code, § 12520) at state expense, we know of no authority which permits him to recover his compensation from litigants against whom he has elected to proceed. The law is to the contrary. (*People* v. *Central Pacific R. R. Co.* (1895) 105 Cal. 576 [38 P. 905]; *Grady* v. *Pacific Mut. Life Ins. Co.* (1964) 61 Cal.2d 673 [39 Cal.Rptr. 914, 394 P.2d 730]; *In re Pacific Coast Bldg.-Loan Assn.* (1940) 15 Cal.2d 155 [99 P.2d 251].)

██ Chodos, of course, cites us to the equitable doctrine of the "common fund" and "substantial benefit" as well as the "private Attor-ney General" theory.

*Winslow* v. *Harold G. Ferguson Corp.* (1944) 25 Cal.2d 274, at page 277 [153 P.2d 714], relied on by Chodos, states that "It is well estab-lished doctrine of equity jurisprudence that where a common fund exists to which a number of persons are entitled and in their interest *success-ful* litigation is maintained for its preservation and protection, an allowance of counsel fees may properly be made from such fund. By this means *all* of the beneficiaries of the fund pay their share of the ex-pense necessary to make it available to them."

██ The common fund principle was more recently described in iden-tical language in both *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10], and *Serrano* v. *Priest* (1977) 20 Cal.3d 25, at page 34 (*Serrano III*) [141 Cal.Rptr. 315, 569 P.2d 1303] as "'when a number of persons are entitled in common to a

specific fund, and an action brought by a plaintiff or plaintiffs for the benefit of all results in the creation or preservation of that fund, such plaintiff or plaintiffs may be awarded attorney's fees out of the fund.'" (See also *Alyeska Pipeline Co. v. Wilderness Society* (1975) 421 U.S. 240 [44 L.Ed.2d 141, 95 S.Ct. 1612].)

An outgrowth of the common fund doctrine, the substantial benefit theory "permits the award of fees when the litigant, proceeding in a representative capacity, obtains a decision resulting in the conferral of a 'substantial benefit' of a pecuniary or nonpecuniary nature. In such circumstance, the court, in the exercise of its equitable discretion, thereupon may decree that under dictates of justice those receiving the benefit should contribute to the costs of its production." (*Serrano v. Priest, (Serrano III) supra*, 20 Cal.3d 25, at p. 38; see also *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 943 [154 Cal.Rptr. 503, 593 P.2d 200]; *Fletcher v. A. J. Industries, Inc.* (1968) 266 Cal.App.2d 313 [72 Cal.Rptr. 146].) The benefit must result "in the conferral of a substantial, actual and concrete, pecuniary or nonpecuniary benefit on the members of an ascertainable class, ..." (*Save El Toro Assn. v. Days* (1979) 98 Cal.App.3d 544, 548 [159 Cal. Rptr. 577].)

In the case at bench there was no common fund established and far from showing the conferral of a substantial benefit upon the Church, the record tends only to establish that the receivership resulted in substantial loss to the Church.

Reliance upon the private attorney general exception is also misplaced. Code of Civil Procedure section 1021.5[6] is dispositive of the claim. The statute in setting forth the requirements for a "private attorney general" award codifies the trial court's traditional equitable discretion. (*Woodland Hills Residents Assn., Inc. v. City Council, supra*; see also *Save El Toro Assn. v. Days, supra*.)

---

[6]Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

In *Serrano III, supra,* 20 Cal.3d 25, at page 45, our Supreme Court articulated three basic factors to be considered in awarding fees under this theory; (1) the strength or societal importance of the public policy vindicated by the litigation; (2) the necessity for private enforcement and the magnitude of the resultant burden upon the plaintiff, and (3) the number of people standing to benefit from the decision.

Our Supreme Court in *Woodland Hills Residents Assn, Inc., supra,* instructed that "'the trial court, utilizing its traditional equitable discretion (now codified in § 1021.5), must realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award under a private attorney general theory.'"

■ In the case at bench, the trial court realistically assessed the litigation and terminated the receivership. It implicitly failed to find that any public right had been vindicated. We agree. When there was no evidence that the Church would benefit from continuation of the receivership, certainly the general public could derive none. And to find benefit to the public in the events taking place under the receivership prior to its termination would be difficult indeed in the face of the Church's uncontroverted evidence of adverse financial and organizational impact brought on by the receivership.

We are of the opinion that the underlying action and its attendant provisional remedy of receivership were from the inception constitutionally infirm and predestined to failure. It follows that the burden of the ill-conceived litigation, including the expenses of the receivership and Chodos' fees for procuring that receivership should not be borne by the prevailing party—the Church. (*Andrade v. Andrade* (1932) 216 Cal. 108 [13 P.2d 676]; *Surety Sav. & Loan Assn. v. National Automobile & Cas. Ins. Co.* (1970) 8 Cal.App.3d 752. [87 Cal.Rptr. 752].)

The order appealed from is affirmed.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied January 6, 1982, and appellants' petition for a hearing by the Supreme Court was denied February 17, 1982. Kaus, J., did not participate therein.