Filed 7/11/24  Southwest Voter Registration etc. v. Ramona Unified School Dist. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT et al., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> RAMONA UNIFIED SCHOOL DISTRICT, <br><br> Defendant and Appellant. | D081500 <br><br><br> (Super. Ct. No. 37-2020-00036554-CU-CR-CTL) |


APPEAL from a judgment and order of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed.

Artiano Shinoff, Daniel Shinoff, Paul V. Carelli, IV and Jack M. Sleeth, Jr., for Defendant and Appellant.

Shenkman & Hughes, Kevin I. Shenkman, Mary R. Hughes and Andrea A. Alarcon for Plaintiffs and Respondents.

Defendant Ramona Unified School District challenges the trial court's finding that it violated the California Voting Rights Act of 2001 (Elec. Code, § 14025 et seq.; Act).  The District, however, fails to show a lack of

substantial evidence to support the court's findings of racially polarized voting and dilution. The District also challenges the court's award of prevailing plaintiff attorney fees to Southwest Voter Registration Education Project, Terry Maxson, and Janie Ramos (the Project). Under the circumstances, we conclude the court was within its discretion to find the Project prevailed. We therefore affirm the judgment in favor of the Project and the order awarding the Project its attorney fees.

I.

A.

The District has five members on its governing board. All board members are elected to four-year terms through staggered elections every two years—two seats are open for election at the same time, then two years later the other three seats are open.

More than 15 years after the Act's enactment, in May 2018, the Project notified the District that its at-large election system violated the Act because it "dilutes the ability of Latinos (a 'protected class')—to elect candidates of their choice or otherwise influence the outcome of the District's board elections." In response, the District approved changing its elections to a trustee-area system at a special meeting in September 2018, selected a map in January 2019, and passed a resolution to seek a necessary waiver from the California Department of Education in February 2019. The District also paid the Project $30,000 in statutory attorney fees under section 10010, which applies when a political subdivision adopts trustee-area elections without a court action.

The District's superintendent retired in July 2019 before seeking the waiver from the state, and the incoming superintendent was unaware that process was not completed until July 2020, at which time the new

superintendent started researching the issue. The District submitted the waiver request in September 2020. With the next election approaching in November 2020 and the at-large election system still in place, the Project informed the District in October 2020 that it would be filing a lawsuit.

In its complaint, the Project sought (1) a declaration from the court that the District's at-large elections violated the Act, (2) injunctive relief enjoining the District from further applying an at-large method of election, (3) injunctive relief requiring the District to implement trustee-area elections employing a lawful map tailored to remedy the District's violation of the Act, (4) a special election to promptly implement trustee-area elections, and (5) an injunction prohibiting anyone who was not lawfully elected from acting as a District board member.

The California Department of Education approved the District's waiver request in November 2020. Because of the District's delay in seeking the waiver, the November 2020 election proceeded as an at-large election.

B.

Trial commenced in May 2022. Given the impending November 2022 election, the Project sought an order for all five seats to be open for election at that time, in addition to its other requests for relief.

During the two-day trial, the Project presented expert witness Morgan Kousser, who did an ecological regression analysis of five elections in the three most recent election cycles to determine whether racially polarized voting occurred in the District. Kousser opined that Latino voters strongly supported the Latino candidate or ballot choice, while "non-Hispanic white"[1] voters did not, and due to the numerical superiority of non-Hispanic white voters, the Latino candidate or ballot measure lost within the District.

---

[1] We use the same terms the parties used to refer to the electorate.

3

The Project also presented David Ely, a demographics expert who prepared data sets for Kousser's statistical analysis. Additionally, he evaluated the trustee-area map that the District developed in 2019 and determined it was not appropriate. He determined that another map—Map 104B—was appropriate and testified that trustee-area one on that map has a population of 52% Latino, which would give Latino voters in that area the power to elect their preferred candidate. The District had adopted Map 104B shortly before trial.

The court ruled that the District's at-large voting system violated the Act because it exhibited racially polarized voting and diluted the votes of Latinos, impairing their ability to select candidates of their choice or influence the outcome of elections. The court found that the appropriate remedy was what the District "has committed to implementing"—electing its board through trustee-area elections under Map 104B, and having three of the five board seats up for election in November 2022, including the seat corresponding to trustee-area one on Map 104B, where Latinos are concentrated. It also permanently enjoined the District from holding any further at-large elections, and ordered that all further elections be by trustee-area under Map 104B. The court explained it was not necessary to order a special election since the next election was "not that long from now." Similarly, it was not necessary to have, and the court expressed concern about potential negative consequences of having, all five board seats open in November 2022.

The Project moved to recover its attorney fees as the prevailing plaintiff under section 14030. In determining who prevailed in the litigation, the court looked to the Project's operative complaint and the District's trial brief to reveal their respective objectives. The court found the Project achieved its

4

litigation objectives, succeeded on a practical level, and furthered the purpose of the Act. Therefore, the Project prevailed and was entitled to recover its attorney fees.

The District appealed from both the judgment and the order awarding the Project's attorney fees.

## II.

## A.

The District asserts it did not violate the Act, arguing (1) the Project did not offer evidence on dilution and (2) the Project's evidence on polarized voting was flawed. The Project, however, *did* present evidence relevant to acceptable methods of analyzing polarized voting and dilution through two experts. And the court did not abuse its discretion in admitting the expert testimony. The District's arguments regarding evidence it presented or evidence the Project's experts did not consider go to the weight of the evidence but do not render the experts' testimony inadmissible. We thus conclude the District fails to establish the lack of substantial evidence to support the trial court's finding that the District violated the Act.

## 1.

The Act provides California voters with greater protections than those provided by the federal Voting Rights Act of 1965 (52 U.S.C. § 10301; VRA). (*Pico Neighborhood Assn. v. City of Santa Monica* (2023) 15 Cal.5th 292, 306 (*Pico*).) It "prohibits an at-large method of election 'that impairs the ability of a protected class' (§ 14027)—as defined by race, color, or language minority group (§ 14026, subd. (d))—'to elect candidates of its choice or its ability to influence the outcome of an election, as a result of the dilution or the abridgment of the rights of voters who are members of a protected class' (*id.*, § 14027)." (*Pico*, 15 Cal.5th at p. 305.) Section 14028, subdivision (a),

5

provides that a violation is established "if it is shown that racially polarized voting occurs in elections for members of the governing body of the political subdivision or in elections incorporating other electoral choices by the voters of the political subdivision." A plaintiff claiming a violation of the Act must establish both: (1) the existence of racially polarized voting—when "the protected class members vote as a politically cohesive unit, while the majority votes 'sufficiently as a bloc usually to defeat' the protected class's preferred candidate" and (2) dilution—a showing that the protected class "has less ability to elect its preferred candidate or influence the election's outcome than it would have if the at-large system had not been adopted." (*Pico*, 15 Cal.5th at pp. 313-315.)

The parties agree we review the trial court's findings of racially polarized voting and dilution in this case for substantial evidence. Because the District asserts factual issues and not legal error in this case, we agree. (*United States v. Blaine County* (9th Cir. 2004) 363 F.3d 897, 909; *Yumori-Kaku v. City of Santa Clara* (2020) 59 Cal.App.5th 385, 410 (*Yumori-Kaku*).)

2.

The Act directs California courts assessing racially polarized voting to federal case law on the VRA. (§ 14026, subd. (e); *Yumori-Kaku*, 59 Cal.App.5th at p. 395.) According to the United States Supreme Court in construing the VRA, "[t]he purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." (*Thornburg v. Gingles* (1986) 478 U.S. 30, 56 (*Gingles*).) The occurrence of racially polarized voting is determined by: (1) "examining results of elections in which at least one candidate is a member of a protected class";

6

(2) examining results of "elections involving ballot measures, or other electoral choices that affect the rights and privileges of members of a protected class"; or (3) considering "the extent to which candidates who are members of a protected class and who are preferred by voters of the protected class, as determined by an analysis of voting behavior, have been elected to the governing body of a political subdivision" at issue. (§ 14028(b).) The methodologies for estimating group voting behavior to establish racially polarized voting include ecological regression. (§ 14026(e); *Gingles*, 478 U.S. at p. 53, fn. 20.)

Here, using ecological regression, Kousser analyzed the three most recent election cycles, and specifically elections involving Latino candidates or ballot choices that affect the rights and privileges of Latinos—i.e., data sets one and two of section 14028(b). He analyzed results of (1) Proposition 58 in 2016 concerning bilingual education, (2) the Attorney General election in 2018 involving a Latino candidate; (3) the Insurance Commissioner election in 2018 involving a Latino candidate; (4) the United States Senator for California election in 2018 involving a Latino candidate; and (5) Proposition 17 in 2020 extending the right to vote to parolees. In each of these elections, Kousser determined that within the District, Latino voters strongly supported the Latino candidate or ballot choice, while non-Hispanic white voters did not; yet, due to the numerical superiority of non-Hispanic white voters, the Latino candidate or ballot measure lost within the District.

For example, in the 2018 election for Insurance Commissioner, the Latino candidate received 71.5% of the Latino vote, and only 22.8% of the non-Hispanic white vote, within the District. As a result of his lack of support from non-Hispanic white voters, the Latino candidate lost by a

7

margin of 27.8% to 72.2% within the District. In this election and the others he evaluated, Kousser determined that Latinos and non-Hispanic white voters in the District voted statistically significantly different from one another to at least a 95% confidence level.

The District does not challenge Kousser's statistical analysis; nor did it seek to rebut it below, as it did not present its own expert. Instead, the District argues Kousser's opinion is flawed because he did not consider results of elections *within* the District itself as opposed to statewide elections, in which at least one candidate was a member of a protected class (i.e., section 14028(b)'s data set one). The only such election, however, is for the District's board. In the same vein, the District also contends Kousser did not consider the extent to which Latino candidates were elected to its board (i.e., data set three).

The District relies on evidence it offered through its superintendent that a Latino served on its board from 1982 to 2012. On cross-examination, Kousser explained that he did not analyze *anything* before 2016 because recent data is more relevant than older years in determining whether racially polarized voting exists. Ely likewise testified that recent data more accurately reflects the current circumstances and, from a data processing standpoint, there is more room for error when looking further back in time. The court acknowledged that if there were Latino board members from 2016 until the present, there would likely be no issue, "but 2016 is a while ago." Kousser also testified that he did not analyze recent elections for the board because there were no Latino candidates. He accurately relied on the Act, which provides for the examination of "results of elections in which at least one candidate is a member of a protected class." (§ 14028(b); see also *Yumori-Kaku*, 59 Cal.App.5th at p. 414.) Kousser explained that where there is an

8

absence of such elections that involve only the geographic unit at issue—i.e., "indigenous" elections—the law provides that "exogenous" elections—those which overlap the boundaries of the unit—are relevant.  (See *Westwego Citizens for Better Government v. City of Westwego* (5th Cir. 1989) 872 F.2d 1201, 1208-1209, fn. 8 & 10.)  Indeed, the United States Supreme Court in *Gingles* suggests flexibility in the face of sparse data.  (*Gingles*, 478 U.S. at p. 57, fn. 25.)  The District cites no authority for the proposition that it is improper to consider exogenous elections.

The District's criticism of Kousser's failure to consider the board election results from 1982 to 2012 goes to the weight of his testimony, which is left to the trial court's reasonable discretion.  (*Yumori-Kaku*, 59 Cal.App.5th at pp. 419, 426.)  The court here considered and weighed the District's evidence that a Latino served on its board from 1982 to 2012 against Kousser's testimony that Latino voters strongly supported the Latino candidate or ballot choice in the three most recent election cycles since 2016 yet were outnumbered by non-Hispanic white voters.  The court in *Gingles* concluded that data from the three most recent election years showing racially polarized voting satisfactorily addressed the proper legal standard.  (*Gingles*, 478 U.S. at p. 61.)  On the other hand, regarding the District's evidence, "the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election" (*id.* at p. 57), and "it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important" (*id.* at p. 68).  The prior success of minority candidates in older elections in the District is also distinguishable from *sustained* success as in *Gingles*, where one district at issue had "persistent proportional

9

representation" of the minority group in the most recent six elections. (*Id.* at p. 77.)

To the extent the District argues Kousser failed to consider that voters in the District belong to one particular political party over another, Kousser accurately explained on cross-examination that *Gingles* instructs that "only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters," because "[i]t is the *difference* between the choices" that results in minority groups having less opportunity to elect their preferred candidate; the reasons why people of difference races vote differently is irrelevant. (*Gingles*, 478 U.S. at p. 63.) The District also provides no authority to support its contention that it could not find a Latino to *appoint* to a vacant board position in 2022 has any relevance to racially polarized voting.

The District conceded below that Kousser qualified as an expert. The court's gatekeeping responsibility at the admissibility stage "is simply to exclude clearly invalid and unreliable expert opinion." (*Yumori-Kaku*, 59 Cal.App.5th at p. 421 [cleaned up].) Because Kousser considered relevant data and conducted the proper analysis set forth in the Act, the court did not abuse its discretion in admitting his expert opinion. (*Aljabban v. Fontana Indoor Swap Meet, Inc.* (2020) 54 Cal.App.5th 482, 505.) The District fails to otherwise establish that Kousser's testimony does not constitute substantial evidence to support the trial court's finding of racially polarized voting.

3.

A claim under the Act "requires not only a showing that racially polarized voting exists, but also that the protected class thereby has less ability to elect its preferred candidate or influence the election's outcome than it would have if the at-large system had not been adopted." (*Pico*, 15 Cal.5th

10

at pp. 314-315.) To show such dilution of a protected class's ability to elect candidates of its choice, there must be proof that "under some lawful alternative electoral system, the protected class would have the potential, on its own or with the help of crossover voters, to elect its preferred candidate." (*Id*. at pp. 307-308.) One way to demonstrate this is to show that the protected class would be "'sufficiently large and geographically compact to constitute a majority in a single-member district.'" (*Id*. at p. 320.)

Here, Ely testified that Map 104B meets all legal redistricting requirements and includes a Latino-majority district in trustee-area one. The parties stipulated to this fact in advance of trial, and the District adopted Map 104B shortly before trial. On appeal, the District argues the Project did not offer any evidence of voter dilution based on the lack of the words "dilution" or "dilute" in the Project's expert witnesses' testimony. Nonetheless, Ely's testimony directly addressed an accepted method of demonstrating dilution. The District fails to provide any argument for why his testimony does not constitute substantial evidence to support the trial court's finding that the at-large election system diluted the votes of Latinos.

\*      \*      \*

In sum, the District fails to establish that the trial court's findings of racially polarized voting and dilution are not supported by substantial evidence.

## B.

The District does not dispute the Act provides for an award of attorney fees to a prevailing plaintiff. (§ 14030.) However, it claims this was "not really" a voting rights case because it had already corrected the violation and the lawsuit should have been dismissed as moot. The District also argues the Project was not the prevailing party because it did not recover anything and

11

the lawsuit did not change anything.  We reject these arguments and conclude the court was within its discretion to find that the Project prevailed.

Prevailing party status should be determined by an evaluation of whether a party prevailed on a practical level, including the extent to which each party obtained its litigation objectives.  (*Zuehlsdorf v. Simi Valley Unified School Dist.* (2007) 148 Cal.App.4th 249, 257.)  In a voting rights action, the plaintiff's litigation objectives may include proving a violation and securing trustee-area elections going forward.  (See *Rey v. Madera Unified School Dist.* (2012) 203 Cal.App.4th 1223, 1236.)  We review the trial court's finding that the Project prevailed under the deferential "abuse of discretion" standard of review.  (*Crawford v. Bd. of Education* (1988) 200 Cal.App.3d 1397, 1406.)  "[T]rial courts are well positioned to evaluate what counts as a win.  The trial court gains familiarity with the parties and the attorneys during the case and the trial."  (*Harris v. Rojas* (2021) 66 Cal.App.5th 817, 825.)  "Through it all, trial judges gain perspectives and insights an appellate court is wise to respect."  (*Ibid.*)

Here, the court acknowledged the District's failure to transition to trustee-area elections before the November 2020 election was unintentional but found the District's at-large election system nonetheless violated the Act.  The court also recognized the District "'committed'" to holding district-based elections going forward but keenly noted the District continued to defend the legality of its at-large elections.  The District could have but did not stipulate to a judgment; to the contrary, the District filed a demurrer, it moved for summary judgment, and, in his closing argument, the District's attorney argued there was no violation of the Act.  Additionally, the District did not adopt an appropriate map until shortly before trial.  This shows the litigation was both necessary and a voting rights case.  By obtaining a judgment, the

Project ensured the District "would follow through with its commitment and remained so committed." The judgment declared the District violated the Act, permanently enjoined the District from holding any further at-large elections, and required the District to conduct trustee-area elections with the map that the Project preferred—all relief the Project sought.

In arguing the Project did not obtain relief, the District relies on the fact that the court declined to order a special election or order that all five seats be open for the next election. The court, however, explained that a special election was not necessary given that the next election was in six months, at which time three seats would be open for election, including the Latino-concentrated trustee-area. The court did not order that the other two seats also be open at the same election because it was concerned about the possible negative consequences of all five board members being new, especially since the current superintendent was going to resign or retire. Under these circumstances, the trial court was well within its discretion in finding that the Project succeeded on a practical level and furthered the purpose of the CVRA.

### III.

The judgment is affirmed. The order awarding attorney fees to the Project is also affirmed. The Project is entitled to recover its costs on appeal.

CASTILLO, J.

WE CONCUR:

McCONNELL, P. J.

RUBIN, J.

13