[No. B161508. Second Dist., Div. Three. Aug. 24, 2005.]

ROXANA GODINEZ et al., Plaintiffs and Respondents, v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and
Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are footnote 1 and DISCUSSION, part 5, as enclosed within double brackets [[]].

## COUNSEL

Bill Lockyer, Attorney General, James Humes and Louis R. Mauro, Assistant Attorneys General, Kenneth R. Williams, Kathleen A. Lynch, Catherine M. Van Aken and Geoffrey L. Graybill, Deputy Attorneys General, for Defendants and Appellants.

English, Munger & Rice, Stephen R. English; Mexican American Legal Defense, Thomas Andrew Saenz; Gretchen M. Nelson; Asian Pacific American Legal Center, Stewart Chih-Ming Kwoh; Greines, Martin, Stein & Richland and Robin Meadow for Plaintiffs and Respondents.

## OPINION

**KLEIN, P. J.**—Defendants and appellants State of California, the State Allocation Board (Board) and its member Ron Joseph, the Office of Public School Construction (OPSC) and its executive officer, Luisa M. Park, Tom Campbell as Director of Finance, Arnold Schwarzenegger as Governor, Philip Angelides as State Treasurer and Steve Westly as State Controller (collectively, defendants) appeal an order granting a motion by plaintiffs and respondents Roxana Godinez et al. (collectively, plaintiffs) for attorney fees, costs and expenses. [[*]]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Plaintiffs are a group of public schoolchildren residing in the Los Angeles Unified School District (L.A. Unified or L.A.USD), as well as their parents and community groups. They sued defendants challenging their regulations and practices in distributing school bond monies for new construction on a first-come-first-served basis, rather than based on a school district's need or priority. The existing system operated to the detriment of densely populated urban school districts, which require much more time to perfect their applications for construction funds due to scarcity of land, environmental issues and other considerations.

The litigation settled after the Board adopted a *time-regulated* priority point regulation, which established a final allotment of $450 million, with the remaining funds to be divided into seven equal allotments to be apportioned on a quarterly basis, commencing with the last quarter of 2000 and ending with the second quarter of 2002. This regulatory change enabled L.A. Unified to apply for, and to share in, the remaining bond funds.

After the matter settled, plaintiffs moved for and obtained an award of some $1.9 million in private attorney general fees (Code Civ. Proc. § 1021.5). In making the award, the trial court found, inter alia, plaintiffs' lawsuit was a "catalyst" which led defendants to modify the pertinent regulation.

The essential issue presented is whether plaintiffs are entitled to private attorney general fees on the ground their litigation, even though it did not result in judicial relief, was a catalyst to defendants' changed behavior. The trial court ruled on the attorney fee motion before the issuance of *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553 [21 Cal.Rptr.3d 331, 101 P.3d 140] (*Graham*) and *Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604 [21 Cal.Rptr.3d 371, 101 P.3d 174] (*Tipton*). Because *Graham*

---

*See footnote, *ante*, page 73.

imposed relevant new limitations on the catalyst theory, we reverse and remand for a reconsideration of the matter.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Proposition 1A.*

On November 3, 1998, the voters approved Proposition 1A, a ballot measure entitled "Class Size Reduction Kindergarten-University Public Education Facilities Act of 1998."[2] Proposition 1A authorized a $9.2 billion bond issue for education facilities—$6.7 billion for K-12 and $2.5 billion for higher education. (§§ 100403, 100425, 100500.) The bond proceeds were to be available to fund K-12 school construction for a four-year period. (§ 100415, subd. (b).) The purpose of Proposition 1A was to provide funding for education facilities for class size reduction, to relieve overcrowding and accommodate enrollment growth, and to repair older schools and for wiring and cabling for education technology. (Stats. 1998, ch. 407, § 30.)

The pertinent implementing legislation (Sen. Bill No. 50 (1997–1998 Reg. Sess.).) is set forth at section 17070.10 et seq. As originally enacted in 1998, section 17072.25 directed the Board (§ 17070.15, subd. (c))[3] to "adopt regulations to develop a mechanism to rank approved applications for new construction funding. This mechanism shall be used to determine the priority of approved applications *when state funds are insufficient.*" (Former § 17072.25, subd. (a), enacted by Stats. 1998, ch. 407, § 4, italics added.) Thus, section 17072.25 initially specified only one situation requiring applications to be ranked based on priority: when there were insufficient state funds to cover all approved applications. Otherwise, monies were to be allocated on a "first-come-first-serve" basis.[4]

---

[2] Proposition 1A is codified at Education Code section 100400 et seq.

All further statutory references are to the Education Code, unless otherwise specified.

[3] The Board was a preexisting state governmental body, established by Government Code section 15490. The Board's function under the local agency allocation law is to make allocations or apportionments of state or federal funds for public works projects in specified situations. (Gov. Code, § 15500, 15502.)

[4] The full text of former section 17072.25 was as follows: "(a) The board shall adopt regulations to develop a mechanism to rank approved applications for new construction funding. This mechanism shall be used to determine the priority of approved applications *when state funds are insufficient.* [¶] (b) The ranking mechanism shall allocate priority points based upon the percentages of currently and projected unhoused pupils relative to the total population of the applicant district or attendance area and the total number of currently and projected unhoused pupils in an applicant district or attendance area. [¶] (c) The board may award priority points based on other factors that in its judgment result in the most equitable distribution of resources among applicants. The additional factors may not constitute greater than a 10-percent weight in the overall priority ranking." (Stats. 1998, ch. 407, § 4, italics added.)

2. *The regulatory process; the Board ultimately adopts a time-regulated priority point regulation enabling higher priority projects submitted later in the bond cycle to receive funding.*

In 1999, the Legislature amended section 17072.25 to require the Board to utilize a priority-ranking system when *either one* of the following two "conditions are met: (1) The total state funds necessary for funding all approved projects pursuant to this chapter exceed the total state funds in the fund for allocation pursuant to this chapter. [¶] (2) The actual amount of unallocated proceeds of state bonds available on or after July 1, 2000, for new construction for the purposes of this chapter is at three hundred million dollars ($300,000,000)." (§ 17072.25, subd. (a), as amended by Stats. 1999, ch. 178, § 1.)

According to the legislative history, the 1999 amendment was needed because existing law "does not specify how to determine that state funds are insufficient." (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 562 (1999–2000 Reg. Sess.) as amended Apr. 15, 1999, p. 2.) The purpose of the amendment was to establish "the conditions under which [the Board] is required to utilize a priority ranking mechanism to fund new school construction projects, rather than a first-come-first-serve process." (*Id.* at p. 1.)

The legislative history lists two supporters of the 1999 amendment: Los Angeles County Office of Education, the source of the amendment; and L.A. Unified. (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 562 (1999–2000 Reg. Sess.) as amended Apr. 15, 1999, p. 2.)

At a meeting on January 26, 2000, the Board addressed the impact of the 1999 amendment to section 17072.25. The statutory amendment required the Board to adopt a priority point mechanism to rank approved applications when either (1) the state funds necessary to fund all approved projects exceed the funds available for allocation, or (2) the available funds on or after July 1, 2000, are at $300 million.

The Board directed OPSC to develop a priority point regulation that addressed the following issues: the ability of the Board to establish a priority point threshold and fund certain projects only; notification to the Legislature when the Board is not approving new construction applications due to lack of funds; and establishment of a provision for reimbursement of expenditures on a new construction project when the project is ready for apportionment but the project is not funded due to the lack of funds. Proposed regulations then were generated.

On March 22, 2000, the Board adopted proposed amendments to California Code of Regulations, title 2 (hereafter regulations), sections 1859.91 and 1859.95.[5]

The proposed amendment to regulation 1859.91 provided in relevant part: "(b) The Board shall implement a priority point system for New Construction Grant requests and apportion funds for New Construction Grant requests *when either of the following occur*: [¶] (1) The State Funds available for New Construction and Modernization Grant requests are insufficient to fund all New Construction and Modernization Grant requests ready for apportionment. [¶] (2) The State funds available for New Construction Grant requests on or after July 1, 2000, is $300 million or less. [¶] (c) All New Construction Grant requests shall be funded in date order received until such time that either (b)(1) or (b)(2) occurs. When either (b)(1) or (b)(2) occurs, the OPSC shall develop a list of all New Construction Grant requests ready for apportionment based on the highest number of priority points assigned to each New Construction Grant request as authorized in Section 1859.92.[6] When two or more New Construction Grant requests have the same number of priority points assigned, those New Construction Grant requests shall then be shown on the list in date order of receipt of the funding application by the OPSC. The Board shall fund the New Construction Grant requests included on this list in the following order: [¶] (1) Based on the highest number of priority points assigned to each New Construction Grant request until a New Construction Grant request will result in $300 million or less available to the Board for New Construction Grants. [¶] (2) Based on a specified minimum number of priority points from zero to 220 priority points assigned to each New Construction Grant request. *The specified minimum number of priority points may be changed at the discretion of the Board at any time*." (Italics added.)

The proposed regulation was transmitted to the Office of Administrative Law (OAL) for review and publication pursuant to the Administrative Procedure Act. (Gov. Code, § 11340 et seq.) In June 2000, the OAL indicated the regulation could not be approved because it provided the specified minimum number of priority points may "be changed at the discretion of the Board at any time."

---

[5] As set forth in greater detail in the subsequent section, plaintiffs filed suit on March 30, 2000. Thus, by the time the litigation commenced, the regulatory process was well under way.

[6] Regulation 1859.92 specified how priority points for a project were to be computed. For example, "A project may receive a maximum of 220 points based on the total of (a), (b) and (c): [¶] (a) A maximum of 100 points for both of the following: [¶] (1) Six points for each percent of current unhoused pupils. [¶] (2) Four points for each percent of projected unhoused pupils."

The Board withdrew the proposed regulation and OPSC staff began to draft new priority point regulations. The Board's implementation committee met on August 4, 2000, and September 13, 2000, in Sacramento, and on October 6, 2000, in Colton, to allow all interested districts and persons to be heard as to the amended priority point regulation to be adopted by the Board.

The Board conducted hearings on the proposed priority point regulation at its meetings on August 23, 2000, September 27, 2000, and October 25, 2000. Priority point regulation proposals were submitted by Board staff, as well as by L.A. Unified and by the Coalition for Adequate School Housing (CASH), an organization representing more than 600 school districts statewide.

On October 25, 2000, after considering the various proposals, the Board approved a revised priority point mechanism that allowed an opportunity for higher ranking projects submitted later in the bond cycle to receive funding priority over lower priority projects that had been submitted earlier. On December 13, 2000, the Board approved the regulation as an emergency regulation.[7] On January 2, 2001, the Board was notified that the OAL had approved the emergency regulation.

### 3. *Litigation history.*

#### a. *Prelitigation correspondence.*

On February 21, 2000, plaintiffs' counsel sent a letter to the Board asserting that its apportionment of Proposition 1A funds violated the California Supreme Court's holdings in *Serrano v. Priest*,[8] which requires "basically equalized education spending, with more, not less, spent on special needs situations. Accordingly, the SAB and the OPSC have a legal obligation to monitor and ensure that their allocation of school facilities funds treats like

---

[7] Regulation 1859.91, as adopted, provided in relevant part: "(a) . . . The Board shall implement a priority point mechanism described in (b) for New Construction Grant requests when either of the following occur: [¶] (1) The amount of New Construction and Modernization Grant requests accepted for processing but not yet apportioned exceed the funds available for New Construction Grants and Modernization Grants. [¶] (2) The funds available for New Construction Grants is $300 million or less. [¶] (b) Once either (1) or (2) in (a) occurs, the Board shall approve and apportion the funds available for New Construction Grant requests based on the following priority point mechanism: [¶] *(1) From the funds available for New Construction Grants, the Board shall establish a final allotment of $450 million to be apportioned in accordance with (2) below. After deducting the $450 million final allotment, the Board shall divide the remaining funds into seven equal allotments, to be apportioned on a quarterly basis, commencing with the last quarter of calendar year 2000 and ending the second quarter of calendar year 2002.*" (Italics added.)

[8] *Serrano v. Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241] (*Serrano I*); *Serrano v. Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929] (*Serrano II*).

districts equally, avoids disparities based on race or wealth, and addresses pressing needs like those faced by districts with severe overcrowding."

The letter protested that the Board's apportionments "have gone very disproportionately to sub-urban and ex-urban areas, and they have been significantly skewed away from districts with high percentages of poor children." The letter demanded that the Board cease making new apportionments until these issues were addressed, and threatened litigation in the event the matter could not otherwise be resolved.

In response, on March 7, 2000, the chief deputy director of the Department of Finance invited counsel to attend upcoming meetings of the implementation committee and the Board "to share your thoughts and suggestions on the best way to address school facilities needs."

### b. *Pleadings.*

On March 30, 2000, plaintiffs filed a combined complaint for injunctive and declaratory relief and petition for writ of mandate. Two months later, a first amended complaint followed.[9]

The pleadings alleged in relevant part: "In congested urban areas, [the Board's] requirements are almost always more difficult and time-consuming to meet than those in suburban and ex-urban districts. Urban districts have much more difficulty finding sites that are appropriate and affordable; the construction of a school in a crowded urban area requires much more community consensus-building; the seller of a school site is much less likely to be cooperating willingly with the district; court proceedings are much more likely to be necessary and lengthy; environmental reviews are much more likely to be complicated and protracted; environmental mitigation is likely to take longer; the preparation of bid-ready plans and specifications will be more challenging and time-consuming due to the smaller sites that are available and the complexities presented by the surrounding urban environment. [¶] . . . All in all, it will usually take a congested urban district significantly longer than a suburban and ex-urban district both to obtain the approvals and to develop the bid-ready plans and specifications that Form 50-04 requires as a condition of being permitted to file applications for project funds. [¶] . . . This disproportionately freezes urban districts out of Proposition 1A new construction funds. [¶] . . . [L.A. Unified], for example, is unlikely to be able to file any further applications for project funding for another eight months at least. By the time it files, most if not all of

---

[9] Thereafter, two additional parties, L.A. Unified and United Teachers Los Angeles, applied for and obtained leave to intervene in the action as plaintiffs in intervention.

Proposition 1A's new school construction funds will have been claimed by districts that have been able to move faster and file earlier."

Plaintiffs alleged, inter alia, the Board's regulations and practices for the allocation of new school construction funds under Proposition 1A, apportioning funds on a "first-come-first-served" basis rather than on the basis of need, violated the equal protection clause of the California Constitution in that it failed to avoid gross disparities in expenditures and education quality.

The complaint detailed the disparities in the Board's per-new-student allocations among various school districts in the Los Angeles area. Plaintiffs alleged, inter alia: L.A. Unified received "a low of $1,107 per new student." In contrast, "Palmdale Elementary, in North Los Angeles County, received $5,902 for every new student it added, and Hesperia, on the outskirts of the city of San Bernardino, received $4,000, but both figures paled in comparison to the $24,851 and $24,278 per new student received by two districts on the eastern edge of the five-county Los Angeles metropolitan region, Lucerne Valley, and Morongo Unified."

c. *Application for preliminary injunction.*

On April 3, 2000, four days after filing the action, plaintiffs filed an application for a preliminary injunction. The application sought to enjoin defendants from apportioning funds for new construction grants until they submitted, and the court approved, an interim needs-based funding system.

(1) *The June 20, 2000 hearing.*

On June 20, 2000, the matter came on for hearing and was argued. The minute order of the hearing states: "Petitioners present some evidence that it is more difficult, and requires more time, for the LAUSD to select and acquire suitable school sites that it takes for other, less urban school districts, to do so, and that the [Board] is distributing the bond money at too fast a rate to permit the LAUSD to compete fairly for the funds. [¶] . . . [¶] It would be grossly unfair to limit the construction of new schools throughout the state to the pace at which the LAUSD can arrange for the construction of new schools, and petitioners cite no authority for the proposition that any constitution or statute requires such accommodation. [¶] If petitioners want the court to order that the bond funds be distributed at a slower pace, it is up to petitioners to propose the pace at which the LAUSD should reasonably be required to present projects to the Board. Only in that way can the court determine whether what petitioners demand is reasonable, in light of the needs of school districts, and school children, throughout the state."

The trial court then continued the matter for further briefing.

(2) *The July 20, 2000 hearing.*

On July 20, 2000, the matter came back on for hearing. The trial court observed: "The court still does not have the information that it requested from petitioners on June 20, 2000. The court still does not know the extent of the delay that the LAUSD would require in order to prepare enough new construction projects to garner what petitioners consider to be a fair share of the bond money. [¶] The proposal by petitioners that bond funds be 'reserved' for a project before they are 'apportioned' to that project violates . . . Section 17070.15(a). . . . [¶] Petitioner[s'] proposal also violates . . . Section 17070.50, which expressly prohibits the Board from apportioning funds to any school district before the district has selected a site and has developed building plans and specifications that have been approved by the State Department of Education."

However, the trial court also noted: "Petitioners have produced evidence of a trend by the Board to release more than the proportionate share of bond proceeds that it has assigned to low priority projects and less than the proportionate share to high priority projects. If seems highly likely that if that trend continues, high priority projects will not be built because the available money has already been spent on low priority projects. It does not appear to the court that the release of funds in that manner by the Board carries out the intention of the legislature."

The trial court then continued the matter for further briefing.

(3) *The August 24, 2000 hearing.*

On August 24, 2000, the application for preliminary injunction came back on for hearing. At that juncture, the trial court made the following ruling:

"1. The duty of the State Allocation Board under Education Code Section 17072.25 is to develop a mechanism to rank approved applications for funding for new school construction. The legislative purpose for imposing that duty upon the Board is to insure that the bond issue funds go to the competing school districts on the basis of their priority as determined by the Board, and not simply on a first come first serve basis, insofar as it is reasonable and practical to accomplish that goal.

"2. The Board is neither required nor permitted by the statute to defer implementing its ranking mechanism after the time that it becomes aware that the funds available from the bond issue will not be sufficient to fund all projects that the Board will approve pursuant to Education Code Section 17072.20 (c).

"3. The Board may adopt a finite time limit within which it will apportion all of the available funds due eligible school districts. June 30, 2002, is not an unreasonable time limit, whether or not such time limit accommodates the schedule of LAUSD, or any other school district, presenting projects to the Board. If the Board adopts such a time limit, the competing school districts will have to modify their schedules to comply with it; the Board need not adopt a time limit to accommodate the schedule of LAUSD or any other school district.

"4. Once the Board adopts such a time limit, its duty under the statute is to apportion bond funds by a method which will fund new construction projects according to their priority, as determined by the Board, to the maximum extent that it is practical to do so. The legislature has manifested its intention that the funds be allocated on that basis, not on a first come first served basis, even if the result is to slow down the allocation of funds, provided that the allocation can be completed within the time limit adopted by the Board."

The trial court then continued the matter to October 24, 2000, and ordered the Board "to Show Cause in writing, and submit a program to implement its ranking of projects in accordance with the foregoing, on or before October 6, 2000."

### d. *Regulatory activity following the August 24, 2000 hearing.*

Following the interim ruling on August 24, 2000, wherein the trial court interpreted portions of the governing statutes, the Board decided to revise the regulation that was the principal focus of the plaintiffs' challenge. Thereafter, the parties stipulated to continue the hearings on the application for preliminary injunction while the amendment to the regulation was prepared for formal adoption.

As indicated, on October 25, 2000, after considering various proposals, the Board voted to adopt a time-regulated priority point regulation with a ranking mechanism that allowed an opportunity for higher-ranking projects submitted later in the bond cycle to receive funding priority over lower-priority projects that had been submitted earlier. The revised regulation 1859.91 established a final allotment of $450 million, with the remaining funds to be divided into seven equal allotments, to be apportioned on a quarterly basis, commencing with the last quarter of 2000 and ending with the second quarter of 2002.

Thereafter, the parties agreed to a settlement of the lawsuit, conditioned on the Board's apportionment of funds under the new regulations. The settlement agreement acknowledged the plaintiffs "intend to apply to the court for an award of costs including attorneys' fees."

e. *The attorney fees motion and order.*

On May 15, 2002, plaintiffs filed their motion for attorney fees, supported by numerous declarations and documents summarizing the proceedings and the basis for the fee claim. Plaintiffs contended they achieved a significant benefit for the public and sought fees under the private attorney general doctrine. On June 5, 2002, the matter came on for hearing and was taken under submission.

On July 12, 2002, the trial court issued an order granting plaintiffs' motion for an award of attorney fees and reimbursement of costs and expenses. The amount of the award was $1,903,695.21.[10]

The trial court found the plaintiffs' lawsuit was a catalyst motivating defendants to change their behavior, stating: "It is clear, from a review of the history of this case, that Judge Yaffee's August 24 Order changed the Defendants' views concerning new-construction apportionments. It is clear that, although the Regulations had to be changed as a result of a 'political process,' the Defendants revised the Regulations in response to Judge Yaffee's August 24 Order."

The trial court further found plaintiffs were the successful party in the litigation and the suit "has resulted in the enforcement of an important right affecting the public interest," in that the suit resulted in bond funds being distributed to competing school districts on the basis of priority, and not simply on a first-come-first-served basis. "A significant benefit, whether pecuniary or nonpecuniary, has been conferred on a large class of persons. As a result of the adoption of the revised version of Regulation 1859.91, approximately $350 million in new-construction apportionments have been made to high priority districts which would not have been made on the invalid first come first served regulations."

The trial court further found the "necessity and financial burden of private enforcement are such as to make the award of attorneys' fees and costs appropriate." The case was "novel, highly complex, vigorously defended, and the parties were under significant time restraints and deadlines in the prosecution of this action."

After determining the lodestar amount, the trial court applied a 1.1 enhancement or multiplier to the fees of English, Munger & Rice, Mexican American Legal Defense and Education Fund and the Law Offices of

---

[10] In addition to attorney fees, the award includes "out-of-pocket litigation expenses" of $48,385.29. Defendants do not challenge that aspect of the trial court's ruling.

Gretchen M. Nelson. The trial court explained: "The legal issues in this lawsuit were novel and difficult. They involved questions arising under the California Equal Protection Clause and the application of provisions of the Education Code and the California Code of Regulations. There was no established body of case law concerning the central issues presented in this case. Plaintiffs' counsel prosecuted this case with extraordinary skill and ability."

The attorney fees order was signed and filed on August 5, 2002.

### f. *Subsequent proceedings.*

On September 11, 2002, defendants filed notice of appeal from the August 5, 2002 attorney fees order.[11]

On November 7, 2002, following the issuance of an order to show cause re dismissal pursuant to settlement, the trial court ordered the case dismissed with prejudice "EXCEPT that the dismissal shall be without prejudice to issues relating to the validity of SAB regulation 1859.42(b) (Projecting Non-Special Day Class Enrollment)."

## CONTENTIONS

Defendants' contentions, including those raised in their supplemental letter briefs following the issuance of *Graham* and *Tipton*, are as follows: plaintiffs were not the successful party in the underlying litigation within the meaning of Code of Civil Procedure section 1021.5; plaintiffs are not entitled to recover their fees for participating in the political process; plaintiffs are not entitled to an award under the catalyst theory because their lawsuit merely accelerated the regulatory process and because they did not make a reasonable attempt to settle the case before filing suit; and the number of hours spent by plaintiffs' counsel in litigating the matter was unreasonable.

---

[11] Although the action was still pending at that time in the trial court, the August 5, 2002 attorney fee order was appealable. "When a court renders an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and directing payment of money or performance of an act, direct appeal may be taken. [Citations.] This constitutes a necessary exception to the one final judgment rule. Such a determination is substantially the same as a final judgment in an independent proceeding. [Citations.]" (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368 [134 Cal.Rptr. 197, 556 P.2d 297].)

## DISCUSSION

1. *General principles.*

 a. *Code of Civil Procedure section 1021.5.*

■ " 'The Legislature adopted [Code of Civil Procedure] section 1021.5 as a codification of the private attorney general doctrine of attorney fees developed in prior judicial decisions.[12] [Citation.] Under this section, the court may award attorney fees to a "successful party" in any action that "has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." . . . [T]he private attorney general doctrine "rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." Thus, the fundamental objective of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases.' [Citation.]" (*Graham, supra,* 34 Cal.4th at p. 565.)

A trial court's decision to award attorney fees under Code of Civil Procedure section 1021.5 is reviewed for an abuse of discretion. (*Graham, supra,* 34 Cal.4th at p. 578.)

---

[12] In its entirety, Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor, unless one or more successful parties and one or more opposing parties are public entities, in which case no claim shall be required to be filed therefor under Part 3 (commencing with Section 900) of Division 3.6 of Title 1 of the Government Code. [¶] Attorneys' fees awarded to a public entity pursuant to this section shall not be increased or decreased by a multiplier based upon extrinsic circumstances, as discussed in *Serrano v. Priest,* [(1977)] 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303]."

b. *Catalyst theory of recovery enables a plaintiff to obtain an attorney fee award even when a plaintiff's suit does not result in a favorable final judgment;* Graham *and* Tipton *impose new limitations on catalyst theory.*

 To encourage suits enforcing important public policies, our Supreme Court has taken "a broad, pragmatic view of what constitutes a 'successful party.' 'Our prior cases uniformly explain that an attorney fee award may be justified even when plaintiff's legal action does not result in *a favorable final judgment.* [Citations.]' " (*Graham, supra,* 34 Cal.4th at pp. 565–566, italics added.) The *catalyst theory,* authorizing an award of attorney fees when a plaintiff's suit is a catalyst to defendant's changed behavior, is an application of the principle "that courts look to the practical impact of the public interest litigation in order to determine whether the party was successful, and therefore potentially eligible for attorney fees." (*Id.* at p. 566.)

In *Graham,* our Supreme Court considered whether the catalyst theory should be abolished in California in light of the United States Supreme Court's rejection of the catalyst theory in *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources* (2001) 532 U.S. 598 [149 L.Ed.2d 855, 121 S.Ct. 1835] as a basis for attorney fee awards under various federal statutes. (*Graham, supra,* 34 Cal.4th at pp. 564–565, 568.)

*Graham* concluded: "the catalyst theory should not be abolished but clarified. In order to be eligible for attorney fees under [Code of Civil Procedure] section 1021.5, a plaintiff must not only be a catalyst to defendant's changed behavior, but the lawsuit must have some merit, . . . and the plaintiff must have engaged in a reasonable attempt to settle its dispute with the defendant prior to litigation." (*Graham, supra,* 34 Cal.4th at pp. 560–561.)

*Tipton, supra,* 34 Cal.4th 604, which was decided the same day as *Graham,* further clarifies the catalyst theory of recovery. *Tipton* held "[a]ttorney fees may not be obtained, generally speaking, by merely causing the *acceleration* of the issuance of government regulations or remedial measures, when the process of issuing those regulations or undertaking those measures was ongoing at the time the litigation was filed. When a government agency is given discretion as to the timing of performing some action, the fact that a lawsuit may accelerate that performance does not by itself establish eligibility for attorney fees." (*Tipton, supra,* 34 Cal.4th at p. 609, italics added.)[13]

---

[13] *Graham* and *Tipton* were decided during the pendency of this appeal. We obtained supplemental letter briefs from the parties addressing the impact of those decisions.

2. *No merit to plaintiffs' contention their lawsuit was more than a mere catalyst in that they obtained judicial relief; in the absence of judicial relief this case is governed by catalyst principles.*

Plaintiffs contend they are not subject to the requirements of *Graham* and *Tipton* because this lawsuit was more than a catalyst. Plaintiffs assert rather than serving as a catalyst to defendants' changed behavior, their lawsuit obtained a " 'judicially sanctioned change in the legal relationship of the parties.' " (*Graham, supra,* 34 Cal.4th at p. 570.) The argument is meritless.

Plaintiffs' argument they obtained judicial relief is based on the August 24, 2000 order. In said order, the trial court, inter alia, directed the Board "to Show Cause in writing, and submit a program to implement its ranking of projects in accordance with the foregoing, on or before October 6, 2000."

Said order was merely an interim ruling, the third in a series of rulings on plaintiffs' long-running application for a preliminary injunction. However, plaintiffs never obtained a preliminary injunction or other judicial relief.

Further, while the August 24, 2000 order provided the Board was authorized to "adopt a finite time limit within which it will apportion all of the available funds due eligible school districts," the order did not direct the Board to change its regulation in any particular manner.

At that hearing, the trial court expressed a clear unwillingness to encroach on the Board's discretion. The trial court stated: "I'm very reluctant to interfere with what I think is the discretion of this board as long as the board is going to exercise its discretion in a prompt enough fashion to implement its priority program before it dispenses out so much money that it's not really possible to do that anymore." The trial court then continued the matter to October 24, 2000.

In view of the above, we reject plaintiffs' contention the August 24, 2000 order amounted to a judicially sanctioned change in the legal relationship of the parties, so as to take this matter out of the catalyst arena. Therefore, plaintiffs' entitlement to private attorney general fees is subject to catalyst theory principles, and *Graham* and *Tipton* are applicable.

3. Graham *applies retroactively to this case.*

Next, plaintiffs contend that even assuming this matter is governed by catalyst principles, *Graham's* presuit demand requirement should be applied prospectively only, and not to this case.

■ As a general rule, judicial decisions are given retroactive effect, even if they represent a clear change in the law. (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978–979 [258 Cal.Rptr. 592, 772 P.2d 1059].) The exception is when considerations of fairness and public policy are so compelling in a particular case that, on balance, they outweigh the considerations that underlie the basic rule. (*Id.* at p. 983.) This exception applies in particular when a party justifiably has relied on the former rule. (*Ibid.*; *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 351 [127 Cal.Rptr.2d 516, 58 P.3d 367].)

■ Plaintiffs argue that *Graham,* specifically, its pre-suit demand requirement, should apply prospectively only. We disagree. We conclude *Graham* is fully retroactive and applies to this case.

*Graham*'s pre-suit demand requirement is not entirely new. As Associate Justice Chin pointed out in his dissent in *Graham* (*Graham, supra,* 34 Cal.4th at p. 600 (dis. opn. of Chin, J.)), it was presaged in *Grimsley v. Board of Supervisors* (1985) 169 Cal.App.3d 960, 966 [213 Cal.Rptr. 108]. Thus, plaintiffs herein were on notice that to be eligible for private attorney general fees, they were obligated to make a reasonable attempt to resolve the matter without litigation.

Further, in *Graham,* the Supreme Court remanded the matter to the trial court to consider the merits of the suit and "whether plaintiffs attempted to reasonably settle the matter short of litigation." (*Graham, supra,* 34 Cal.4th at p. 577.) Thus, to be eligible for attorney fees under the catalyst rule, the plaintiffs in *Graham* were required to establish on remand that they complied with all catalyst rule requirements. (*Ibid.*)

For these reasons, we conclude the principles articulated in *Graham* are fully applicable herein.

4. *Application of the* Graham/Tipton *factors to this case.*

a. *Substantial evidence supports trial court's determination plaintiffs' litigation was a catalyst to defendants' changed behavior.*

■ In order to obtain attorney fees without a judicially recognized change in the legal relationship between the parties, a plaintiff must first establish "(1) the lawsuit was a catalyst motivating the defendants to provide the primary relief sought . . . ." (*Tipton, supra,* 34 Cal.4th at p. 608.)

Here, in granting plaintiffs' motion for attorney fees, the trial court ruled: "Fees are appropriate when a plaintiff's lawsuit was a catalyst motivating

defendants to provide the primary relief sought or when plaintiff vindicates an important right by activating defendants to modify their behavior. [Citation.] It is clear, from a review of the history of this case, that Judge Yaffee's August 24 Order changed the Defendants' views concerning new-construction apportionments. It is clear that, although the Regulations had to be changed as a result of a political process, the Defendants revised the Regulations in response to Judge Yaffee's August 24 Order."

■ Our role on review is to determine whether substantial evidence supports the trial court's factual finding that plaintiffs' lawsuit was a catalyst to defendants' changed behavior. (*Graham, supra,* 34 Cal.4th at p. 577.) The record contains ample support for the trial court's factual finding.

It is unnecessary to reiterate the voluminous evidence herein. It is sufficient to note that in January 2001, the various parties, including defendants, filed a *joint* status conference report. The report stated in relevant part: *"Following an interim ruling on August 24, wherein Judge Yaffee interpreted portions of the governing statute, the [Board] decided to revise the regulation that was the principal focus of the plaintiffs' challenge.* Thereafter, the parties stipulated to continue the hearings before Judge Yaffee while the amendment to the [Board] regulation was prepared for formal adoption." (Italics added.)

On this record, the trial court reasonably could infer that plaintiffs' lawsuit was a catalyst to defendants' changed behavior in revising the priority-point regulation in the manner which they did.

We reject defendants' contention the lawsuit, at best, accelerated the regulatory process, and that therefore *Tipton* precludes an award of catalyst attorney fees. (*Tipton, supra,* 34 Cal.4th at p. 609.) The lawsuit did more than accelerate the regulatory process. It fundamentally changed the nature of the priority-point regulation the Board ultimately adopted. As a consequence of plaintiffs' lawsuit, the priority-point regulation became *time-regulated.* As indicated, regulation 1859.91, as adopted, established a final allotment of $450 million, with the remaining funds divided into seven equal allotments, to be apportioned on a quarterly basis, commencing with the last quarter of 2000 and ending with the second quarter of 2002. Thus, the new regulation slowed down the apportionment process, giving densely populated urban districts, such as L.A. Unified, a fair opportunity to compete for the remaining Proposition 1A monies.

In sum, substantial evidence supports the trial court's finding that plaintiffs' lawsuit was a catalyst to defendants' changed behavior in revising the pertinent regulation.

*No merit to contention that trial court improperly awarded attorney fees to plaintiffs for their political activity; trial court properly awarded fees because it found the litigation was a catalyst to defendants' changed behavior.*

Defendants cite *Crawford v. Board of Education* (1988) 200 Cal.App.3d 1397 [246 Cal.Rptr. 806] for the proposition that "the private attorney general doctrine limits awards of fees to litigants who successfully utilize the *judicial process* to achieve their aims. The doctrine simply does not, nor should it, encompass successful lobbying efforts by those who seek to influence the Legislature or the electorate on any particular issue." (*Id.* at p. 1408.) Defendants assert that pursuant to *Crawford*, plaintiffs are not entitled to recover their fees for participating in the political process, and the mere filing of the lawsuit, without proof of causation, cannot substantiate a fee claim.

*Crawford* is merely another application of the catalyst doctrine to a particular fact situation and defendants have taken the quoted passage out of context. In *Crawford*, various interveners sought an award of attorney fees pursuant to the private attorney general doctrine for their participation in the remedial phase of a school desegregation case. The trial court denied an award and the reviewing court affirmed the trial court's ruling. (*Crawford v. Board of Education, supra,* 200 Cal.App.3d at pp. 1399–1400.)

*Crawford* recognized that "[f]ees have been found appropriate when an action was the '*catalyst*' motivating defendants to provide the relief sought, or when it 'activated' defendants to modify their behavior. [Citation.]" (*Crawford v. Board of Education, supra,* 200 Cal.App.3d at p. 1406, italics added.) On the other hand, "[i]f a lawsuit is successful, but the intervener contributed little or nothing of substance in producing that outcome, then fees should not be awarded. [Citation.] The same is true where events transpiring outside the litigation process render an intervener's efforts nugatory. [Citations.] [¶] Applying these principles to the instant case, we can only conclude that *the record supports the trial court's finding that interveners failed to affirmatively demonstrate a causal relationship between their participation in the remedial phase of this litigation and the practical result which obtained.* . . . [¶] . . . [T]he plan ultimately adopted by the District and approved by the trial court resulted from the passage of Proposition 1 in November 1979. By amending the Constitution to prohibit mandatory busing in school desegregation cases [citation], the citizens of this state, not interveners, produced the practical result which obtained." (*Id.* at pp. 1407–1408, italics added.)

*Crawford* is entirely distinguishable in that here, as already discussed, substantial evidence supports the trial court's finding that plaintiffs' lawsuit was a catalyst to defendants' revision of the pertinent regulation.

Alternatively, defendants contend that in the instant case, "the political process and the judicial process are so intertwined" and the private attorney general doctrine "should not be expanded to include a hybrid between the political and judicial process." The argument is unavailing. *Wallace v. Consumers Cooperative of Berkeley, Inc.* (1985) 170 Cal.App.3d 836 [216 Cal.Rptr. 649], upheld the trial court's award of attorney fees for services rendered in conjunction with administrative hearings on the suspension of mandatory minimum retail milk prices, on the ground the administrative proceedings and the litigation were " '*intertwined inextricably.*' " (*Id.* at p. 848, italics added.)

■ For these reasons, we reject defendants' contention the trial court improperly rewarded plaintiffs for participating in the political process. The trial court herein awarded fees to plaintiffs because it found the litigation was a *catalyst* to defendants' changed behavior, and that finding is supported by the record.

> b. *Remand required for a determination as to whether the lawsuit had merit.*

■ In addition to determining a lawsuit's catalytic effect, the trial court is required to determine whether the lawsuit had "some merit." (*Graham, supra,* 34 Cal.4th at p. 561.) To be entitled to attorney fees herein, plaintiffs must establish "that the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense . . . ." (*Tipton, supra,* 34 Cal.4th at p. 608.) Here, it is unclear whether the trial court considered the merits of the suit. Therefore, the matter must be remanded for a determination of this issue. (*Graham, supra,* 34 Cal.4th at p. 577.)[14]

> c. *Remand required for a determination as to whether plaintiffs engaged in a reasonable attempt to settle the dispute prior to litigation.*

In ruling on the attorney fee motion, the trial court did not consider whether plaintiffs attempted to reasonably settle the matter short of litigation.

---

[14] We note, however, the Attorney General in its supplemental letter briefs does not contend the lawsuit lacked merit. We also observe that *Serrano I* and *Serrano II* held that "for purposes of assessing our state public school financing system in light of our state constitutional provisions guaranteeing equal protection of the laws (1) discrimination in educational opportunity on the basis of district wealth involves a suspect classification, and (2) education is a fundamental interest." (*Serrano II, supra,* 18 Cal.3d at pp. 765–766.)

■ As indicated, *Grimsley* held "attorney fees under Code of Civil Procedure section 1021.5, will not be awarded unless the plaintiff seeking such fees had reasonably endeavored to enforce the 'important right affecting the public interest,' *without litigation and its attendant expense*." (*Grimsley v. Board of Supervisors, supra,* 169 Cal.App.3d at p. 966, original italics.) *Graham* expanded on this requirement, stating: "Lengthy prelitigation negotiations are not required, nor is it necessary that the settlement demand be made by counsel, but a plaintiff must at least notify the defendant of its grievances and proposed remedies and give the defendant the opportunity to meet its demands within a reasonable time. (See, e.g., *S.D. v. Faulkner* [(1989)] 705 F.Supp. [1361,] 1363 [letter notifying defendants of plaintiffs' grievances, plus discussions over two-month period]; see also *Garrison v. Board of Directors* (1995) 36 Cal.App.4th 1670, 1676 [43 Cal.Rptr.2d 214] [Pub. Resources Code, § 21177, subd. (b) requires California Environmental Quality Act litigants to inform agency of objections before litigation to give agency opportunity to respond].) *What constitutes a 'reasonable' time will depend on the context*." (*Graham, supra,* 34 Cal.4th at p. 577, italics added.)

Here, plaintiffs contend that because the first-come-first-served system was irretrievably placing $75 million per month beyond the reach of high-need urban school districts, they were not required to give more than five weeks' notice before filing suit. It is not the role of this court to weigh the evidence and make a determination in the first instance as to whether plaintiffs' February 21, 2000 letter to the Board, or any other contacts, satisfied the requirement of a reasonable prelitigation attempt at settlement. The trial court shall also address this issue on remand.[15]

[[*5. No abuse of discretion in amount of attorney fee award.*[*]]]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The August 5, 2002 attorney fee order is reversed. The matter is remanded to the trial court to determine the following requirements for an award of attorney fees under the catalyst theory: (1) whether plaintiffs' lawsuit had

---

[15] We note *Graham* was in a procedural posture similar to this case. The trial court previously had determined plaintiffs' lawsuit had a catalytic effect. The Supreme Court reversed and remanded the matter for a determination as to (1) the merits of the suit, and (2) whether plaintiffs attempted to reasonably settle the matter short of litigation. (*Graham, supra,* 34 Cal.4th at p. 577.)

[*]See footnote, *ante,* page 73.

merit; and (2) whether plaintiffs made a reasonable attempt to settle the case before filing suit. If the trial court determines that plaintiffs satisfy those requirements of *Graham/Tipton*, the trial court shall reinstate the award in its entirety. If the trial court reinstates the original award, the trial court shall also determine whether plaintiffs are entitled to interest on the award, and if so, as of what date. The parties shall bear their respective costs on appeal.

Kitching, J., and Aldrich, J., concurred.

On September 22, 2005, the opinion was modified to read as printed above.