Filed 6/22/22  Coalition for Adequate School Housing v. State Allocation Bd. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| COALITION FOR ADEQUATE SCHOOL HOUSING et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>STATE ALLOCATION BOARD et al.,<br><br>    Defendants and Appellants. | G058987<br><br>(Super. Ct. No. 30-2018-01029962)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on May 31, 2022, be modified as follows:

On page 19, after first full paragraph, a new paragraph is added between the two full paragraphs that begin on that page.  The new paragraph reads as follows:

"It is not our place, as it was not the trial court's, to instruct the Board how to exercise its discretion.  The Board could decide it cannot justify its earlier apportionments and make changes accordingly.  It could justify the reasons for the earlier apportionments through a written decision.  Or it could do something else, as long as the Board's decision and its reasoning comply with relevant law."

This modification does not change the judgment. The petition for rehearing is DENIED.


MOORE, J.


WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| COALITION FOR ADEQUATE SCHOOL HOUSING et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> STATE ALLOCATION BOARD et al., <br><br> Defendants and Appellants. | G058987 <br><br> (Super. Ct. No. 30-2018-01029962) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Melissa R. McCormick, Judge.  Affirmed in part, reversed in part and remanded.

Orbach Huff & Henderson, Philip J. Henderson, Glenn N. Gould, Carolyn M. Aguilar and Zachary N. Scalzo for Plaintiffs and Appellants Santa Ana Unified School District and Val Verde Unified School District.

The Tao Firm, Terry T. Tao, Joseph M. Rossini, Jennifer D. Cantrell and Martin A. Hom for Plaintiffs and Appellants Coalition for Adedquate School Housing, Cypress School District, Savanna School District, Bakersfield City School District and Central Unified School District.

Xavier Becerra and Rob Bonta, Attorneys General, Thomas S. Patterson, Assistant Attorney General, Anthony R. Hakl and Nelson R. Richards, Deputy Attorneys General for Defendants and Appellants.

\*       \*       \*

This case is about how school bonds are ultimately funded. According to the plaintiffs, the Coalition for Adequate School Housing and a number of school districts (collectively the Coalition), the defendant, the State Allocation Board (the Board) is required by statute to apply an inflation adjustment at the time there are funds ready to disburse to an approved project. The Board, the plaintiffs argue, has no authority to exercise discretion as to whether to apply an inflation adjustment. The Board disagrees, contending that regulations give it that discretion.

The trial court made numerous findings after considering the Coalition's petition for a writ of mandate (Code Civ. Proc., § 1085), which sought reversal of the Board's decision. The court found the Board did not have a duty to include inflation adjustments in the funds disbursed to an approved project. It did, however, find the Board had abused its discretion by excluding inflation adjustments because it did not provide any reasoning for its decision, and granted the Coalition's requested writ of mandate.

In the appeal, the Board seeks reversal of the trial court's decision with respect to its purported abuse of discretion. In the cross-appeal, the Coalition asks us to, among other things, conclude the Board had a ministerial duty to fund projects at the inflation-adjusted level and that one of the Board's regulations was invalid. Ultimately, we reject the arguments in the appeal and the cross-appeal almost in their entirety.

We find the court's only error was the remedy it chose for the Board's abuse of discretion. Rather than directing the Board to reapportion funds in a specific way, the court should have sent the matter back to the Board to exercise its discretion in accordance with the law. By directing the Board how to allocate the funds, the trial court impermissibly substituted its judgment for the Board's judgment. Accordingly, we affirm in part, reverse in part, and remand, vacating the writ issued by the trial court.

2

I

FACTS

*Background*

Before we delve into the factual basis for this lawsuit, we must spend some time reviewing, in general, what happens once a school bond is approved by the voters. Unfortunately, nobody has yet written a catchy song – perhaps "I'm Just a Bond"[1] – explaining this process, which is set forth the Education Code and implementing regulations.[2] Despite the lack of rhyming lyrics and an entertaining tune, we shall do our best to summarize this rather complex and obscure process as concisely as possible.

We begin with the Legislature's adoption of the Leroy F. Green School Facilities Act of 1998 (Sen. Bill No. 50 (1997-1998 Reg. Sess.); Stats. 1998, ch. 407, § 4) (the Act). The Act's purpose was to provide adequate education facilities to, among other things, accommodate the increasing number of students and decrease class sizes. (§ 17070.10 et seq.) The Act, therefore, "governs the allocation of state funds for school facilities construction." (*California Charter Schools Assn. v. Los Angeles Unified School Dist.* (2015) 60 Cal.4th 1221, 1230.)

The Act also established the State School Facilities Fund to pay for construction projects. (*Sanchez v. State of California* (2009) 179 Cal.App.4th 467, 473.) The money set aside for such projects are sometimes referred to as the School Facility Program, or SFP. (*Ibid.*; see § 17070.40, subd. (a)(1); Cal. Code Regs. tit. 2, § 1859.2.)[3] Funds become available through the issuance of state bonds as approved by the voters.

---

[1] With apologies to Schoolhouse Rock! (See "I'm Just a Bill," music & lyrics by Dave Frishberg. Vocals by Jack Sheldon. ABC Television, 1976.)

[2] Subsequent statutory references are to the Education Code unless otherwise indicated.

[3] Subsequent references to Title 2 of the California Code of Regulations shall be cited as "Regulation" followed by the section number in the text, and "2 C.C.R.," followed by the section number in citations.

(See, e.g., *Godinez v. Schwarzenegger* (2005) 132 Cal.App.4th 73, 78; §§ 101110, 101112.) The SFP provides funds to school projects that are ready to commence construction. Funding is provided in the form of per-pupil grants, with supplemental grants available when the applying district is eligible for them. (§§ 17072.10, 17074.10.)

The Board oversees this process along with the Office of Public School Construction (the Office), which acts as staff for the Board. (§ 17070.30; Gov. Code, §§ 14620, 15490-15492; 2 C.C.R., § 1859.2.)[4] To facilitate its role, the Board promulgates regulations pursuant to authority granted under the Act. (§ 17070.35; 2 C.C.R., §§ 1859-1859.199.)

The Board consists of 10 members, including six members of the Legislature, the Superintendent of Public Instruction, one member appointed by the governor, and the directors (or designees) of the Department of General Services and the Department of Finance, the latter acting as the Board's chairperson. The Board's role in this process is to determine each school district's eligibility to receive bond funds, and therefore, districts submit proposed projects to the Board for approval. (§§ 17070.35, subd. (a)(3)-(4), 17072.20, 17073.10.) We need not discuss the project approval process here, but suffice to say that it is a complex one, which requires detailed information from the school district.

From the pool of approved projects, it is also the Board's responsibility to apportion the available funds between eligible districts. (§ 17070.35, subd. (a)(4); *Sanchez v. State of California* (2009) 179 Cal.App.4th 467, 473.) Once funds are apportioned, they are reserved "for the purpose of eligible new construction,

---

[4] "The Board was a preexisting state governmental body, established by Government Code section 15490. The Board's function under the local agency allocation law is to make allocations or apportionments of state or federal funds for public works projects in specified situations." (*Godinez v. Schwarzenegger*, *supra*, 132 Cal.App.4th at p. 78, fn. 3.)

4

modernization, or hardship approved by the board for an applicant school district." (§ 17070.15, subd. (a).)

Since the Act was adopted in 1998, California voters have approved bond measures for school funding multiple times, in November 1998,[5] November 2002, March 2004, November 2006, and November 2016. Bonds generally include funding for new construction, modernization, overcrowding relief, and other needs relevant to the Act's purpose. (See, e.g., § 17070.15, subd. (a).)

As we noted above, funds are primarily available in the form of per-pupil grants. In 1998, for example, maximum grants ranged from $5,200 to $7,200 per pupil for new construction. (§ 17072.10, subd. (a).) Under the Act, the Board must account for inflation by using the statewide cost index for class B construction, also known as the construction cost index, or CCI. (§§ 17072.10, subd. (b), 17074.10, subd. (b), 2 C.C.R., §§ 1859.2, 1859.71.) Annual inflation adjustments from 2013 to 2017 ranged from 1.74 to 4.27 percent.

Because funding under the Act is based on bond measures approved by the voters, it is unsurprising that the funds available often fall short of the amounts requested by school districts. From 1998 to 2012, pursuant to Regulation 1859.95, when no funds were available to apportion, the Board had the authority to approve projects and place them on one of two unfunded lists (the Unfunded List).[6] (2 C.C.R., § 1859.2.)

When a project was placed on the Unfunded List, the district was notified that an unfunded approval did not guarantee a future apportionment. Essentially, such projects were placed in a holding status. Should they receive funding, Unfunded List projects "may receive" CCI adjustments for inflation. (2 C.C.R., § 1859.107.)

---

[5] This bond measure was placed on the ballot by the Legislature as part of the Act.

[6] Understanding the difference between the two lists is not critical for our purposes.

By 2012, the Board had decided to stop using the Unfunded List and replaced it with a list called the Applications Received Beyond Bond Authority List (the Applications Received List). (2 C.C.R., § 1859.95.1.) Accordingly, the procedures that are the subject of the instant case are now deprecated.

Over the years, the Board considered the issue of how projects on the Unfunded List should be apportioned if funds became available. Should they be funded at the per-pupil grant levels existing at the time the project was approved and placed on the Unfunded List? Or should they be funded at the levels that would be appropriate in the future, when an initiative was passed? In 2012, the Board considered the issue, but did not take action and therefore did not approve the award of inflation adjustments on projects on the Unfunded List.

The case before us involves projects submitted or approved before October 31, 2012, when the Board stopped using the Unfunded List and switched to the Applications Received List. Around that same time, the SFP ran out of funds that had been authorized in 2006.

In a January 2013 meeting, the Board again decided not to approve adjustments for projects placed on the Unfunded List before 2013. Therefore, the final version of the Unfunded List included grant levels based on the date the projects were initially approved and placed on the list. The Unfunded List included hundreds of projects, approved for anywhere from a few hundred dollars to millions.

In November 2016, the voters approved Proposition 51, which authorized the state to issue additional bonds.

Following the approval of Proposition 51, Office staff prepared a report for the Board with an overview of the project lists, including the Unfunded List and the Applications Received List. The Board reviewed these at a January 2017 meeting.

As of June 2017, the Board again assessed the situation. Given the passage of Proposition 51, the Board had the authorization but did not yet have the cash to

apportion funds for projects. Importantly, for our purposes, the projects were approved at the same amount that they were first approved for when they were placed on the Unfunded List.

At this point, school districts with projects on the Unfunded List that wanted to receive apportionments to complete their projects went through a "priority funding process" outlined in the Board's regulations. (2 C.C.R., § 1859.90.2.) Almost all of the districts with projects on the Unfunded List requested apportionments. The Board scheduled those projects for apportionments at its September 6, 2017 meeting. By that date, a bond sale had taken place. Office staff prepared a consent agenda of $446 million in projects that had completed the priority funding process. The projects that were approved prior to November 1, 2012 were approved at the funding levels reflecting the date of their approval, in other words, without inflation adjustments. The apportionments were approved by the Board.

Thereafter, some school districts objected to their apportionments based on the per-pupil grant amount without the CCI increase factored in. The Board's chair denied the requests.

A 2018 memo prepared by the Office, which ran hundreds of pages with attachments (exhibit 38), comprehensively reviewed the history of this issue. According to the memo, between 1999 and 2012, "[t]he per-pupil grant levels used when apportioning [Unfunded List] projects varied depending on the circumstances surrounding the unfunded list at that point in time." Such circumstances might include, for example, anticipated construction costs.

*The Instant Lawsuits*

Subsequently, a number of school districts and the Coalition filed lawsuits relating to the Board's action. The districts each had one or more projects on the Unfunded List. The cases were eventually consolidated into a single action via

7

stipulation. The case filed by the Coalition, Cypress School District, and Savanna School District was designated the lead case, and the parties to the remaining cases were bound by the outcome in the lead case. The Coalition's action included a writ petition pursuant to Code of Civil Procedure section 1085 and complaint for declaratory relief. The Coalition argued in its writ petition that the Board "had the mandatory and ministerial duty" to apportion funds to the projects on the Unfunded list with construction cost index adjustments through 2017. In its claim for declaratory relief, the writ alleged the Board had "arbitrarily and capriciously" apportioned the funds at the 2012 per-pupil amounts rather than at 2017 levels.

The parties briefed the writ petition first. Essentially, the petition argued that "sections 17072.10(b) and 17074.10(b) make mandatory the application of the approved [construction cost index] adjustments"[7] for Unfunded List projects. It also contended the Board misinterpreted Regulation 1859.107, which states: "A funding application . . . that has received an approval . . . but has not received an apportionment, may receive an adjustment . . . at the time the apportionment is made." The Coalition argued this regulation violated the relevant provisions of the Education Code, rendering the apportionments illegal and invalid. The lack of inflation adjustments resulted, according to plaintiffs, in some $9.4 million less in funding.

As the Board points out, the trial court did not appear to rely on these arguments at the hearing on the petition, but instead focused on an argument that had gone essentially unbriefed, whether the apportionments constituted an abuse of

---

[7] Sections 17072.10, subdivision (b) and 17074.10, subdivision (b) address, respectively, new school construction grants and modernization grants. Subdivision (b) of each section includes the same language regarding construction cost index adjustments: "The board annually shall adjust the per-unhoused-pupil apportionment to reflect construction cost changes, as set forth in the statewide cost index for class B construction as determined by the board."

8

discretion.  After the hearing, the court issued a statement of decision granting the Coalition's writ petition.

The trial court determined that the Board did not have a duty to include CCI adjustments for projects that had been placed on the Unfunded List, as the statutes did not state otherwise.  "Neither section 17072.10 nor section 17074.10 addresses apportionments made after a project has been placed on an Unfunded List.  To the contrary, those sections require the [Board] to adjust annually the per-pupil grant amounts set forth in subsection (a) of each statute.  Neither section contains any further directive about how those adjusted amounts are to be used under particular circumstances or, more specifically, when the [Board] makes apportionments for projects that have previously been placed on an Unfunded List.  As a result, neither section 17072.10 nor section 17074.10 created a ministerial duty for the [Board] to have included the intervening construction costs index adjustments in the 2017 apportionments for the Petitioner Districts' projects."

Plaintiffs had also argued that Regulation 1859.107 was invalid.  As noted above, that regulation states:  "A funding application, with the exception of funding applications identified in Subsection (a) below, that has received an approval pursuant to Section 1859.95, but has not received an apportionment, may receive an adjustment as allowed under Sections 1859. 71, 1859.71.2(c), 1859. 78.4(b) or 1859. 78 at the time the apportionment is made."  The trial court rejected plaintiffs' argument, finding that the regulation is consistent with the Act and reasonably necessary to effectuate its purpose.  It also found the plain language of the regulation confers discretion on the Board to decide whether intervening CCI adjustments are included in apportionments for Unfunded List projects.

The court did conclude, however, that the Board had abused its discretion by not including CCI adjustments in plaintiffs' projects.  It noted that plaintiffs had "presented evidence that for other applications the [Board] has included intervening

9

construction costs index adjustments in later apportionments and evidence that the [Board] has, at least sometimes, required such adjustments to be included in later apportionments."

Further, the Board had not offered any explanation or reasoning regarding CCI adjustments for the subject apportionments. Had it done so, plaintiffs' "showing might not suffice to demonstrate an abuse of discretion, particularly applying the required 'extremely deferential test.' [Citation.] [The Board], however, made no showing regarding their exercise of discretion to exclude the intervening adjustments from the 2017 apportionments. Indeed, [the Board]'s position at the hearing was that they need not do so because the court cannot review the [Board]'s discretionary acts. As discussed above, the court does not agree. Because [the Board] elected to stand on the argument that the [Board]'s discretionary decision to omit the adjustments from the 2017 apportionments is unreviewable, the court has no basis on which to conclude that the [Board] 'adequately considered all relevant factors, and . . . demonstrated a rational connection between those factors, the choice made, and the purpose of the enabling statute,' [citation], or to conclude that the decision had evidentiary support." Accordingly, the trial court granted the petition. As far as we can tell, no action was taken on the cause of action for declaratory relief.

The court ultimately entered a judgment vacating the September 2017 apportionments made to plaintiffs. The court directed the Board to make new apportionments using the 2017 and 2018 per-pupil grant levels.

10

II

DISCUSSION

Rather than approach the appeal and cross-appeal entirely separately, as we typically would, in the interest of brevity, we address issues in the order in which they arise logically.

*Procedural Arguments*

Before we reach the crux of the issues, the Board and the Coalition each raise a number of procedural arguments regarding waiver, invited error, and "theory of the case." We find that none of these points are well taken. As to waiver of various contentions (argued by both sides), we find that to the extent reasonably possible, all pertinent issues were raised in the trial court. Even if we were to find otherwise, "we have discretion to consider an issue not properly raised in the trial court, if it presents a pure question of law on undisputed factual evidence regarding . . . a matter affecting the public interest or the due administration of justice." (*Vikco Ins. Services, Inc. v. Ohio Indemnity Co.* (1999) 70 Cal.App.4th 55, 66-67; see *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 800.) This is such a case, and we do not find that a decision on the merits would result in fundamental unfairness to any party.

Plaintiffs also argue the Board is estopped from making various arguments based on the "theory of the case" doctrine and invited error.[8] As to theory of the case, we find the doctrine simply does not apply, as the Board has not changed positions or adopted a new theory on appeal. Nor does invited error apply here. The doctrine of invited error "prevent[s] a party from misleading the trial court and then profiting

---

[8] Moreover, we find plaintiffs make far too much over the document (exhibit 38; see 2018 report referenced *ante*) that they now contend the Board should be estopped from arguing. The Board does not rely on this document to justify its 2017 decision, but to explain the history of the issue.

therefrom in the appellate court." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.) We do not find that the Board has misled the court in any manner. Finally, because this case presents a matter of public interest, it would be a disservice to resolve it based on any grounds except the merits.

*Statutory Framework and Standard of Review*

"A writ of mandate lies under Code of Civil Procedure section 1085 '"to compel the performance of a legal duty imposed on a government official"' or 'a public body.' [Citations.] 'To obtain relief under Code of Civil Procedure section 1085, "'the petitioner must show there is no other plain, speedy, and adequate remedy; the respondent has a clear, present, and ministerial duty to act in a particular way; and the petitioner has a clear, present and beneficial right to performance of that duty. [Citation.] A ministerial duty is one that is required to be performed in a prescribed manner under the mandate of legal authority without the exercise of discretion or judgment.'"'" (*Public Employment Relations Bd. v. Bellflower Unified School Dist.* (2018) 29 Cal.App.5th 927, 939.)

"'In reviewing a judgment granting or denying a writ of mandate petition, "'we apply the substantial evidence standard of review to the court's factual findings . . . .'"' [Citation.] Factual findings are examined for substantial evidence and any conflicts in the evidence are resolved in favor of the prevailing party. [Citation.] However, '[o]n questions of law, including statutory interpretation, the appellate court applies a de novo review and makes its own independent determination.'" (*Public Employment Relations Bd. v. Bellflower Unified School Dist.*, *supra*, 29 Cal.App.5th at p. 939.)

*Sections 17072.10 and 17074.10*

As noted above, sections 17072.10, subdivision (b), and 17074.10, subdivision (b), address inflation increases for per-pupil grants for new construction and modernization respectively. But a little context may be helpful. Section 17072.10, subdivision (a), for example, begins as follows: "(a) The board shall determine the maximum total new construction grant eligibility of an applicant by multiplying the number of unhoused pupils calculated pursuant to Article 3 (commencing with Section 17071.75) in each school district with an approved application for new construction, by the per-unhoused-pupil grant as follows: [¶] (1) Five thousand two hundred dollars ($5,200) for elementary school pupils. [¶] (2) Five thousand five hundred dollars ($5,500) for middle school pupils. [¶] (3) Seven thousand two hundred dollars ($7,200) for high school pupils."

The next subdivision is the one at issue here, which addresses inflation adjustments: "(b) The board annually shall adjust the per-unhoused-pupil apportionment to reflect construction cost changes, as set forth in the statewide cost index for class B construction as determined by the board." (§ 17072.10, subd. b.)

The rest of the statute addresses exceptions – adjustments pursuant to regulation for exceptional needs and supplemental grants. (§ 17072.10, subds. (c), (d), (e).)

Section 17074.10 is substantially similar. Subdivision (b) of section 17074.10 states: "The board shall annually adjust the factors set forth in subdivision (a) according to the adjustment for inflation set forth in the statewide cost index for class B construction, as determined by the board." Section 17074.10 includes different maximum grant amounts for modernization and somewhat different language in the subdivisions following (b). But both statutes are similar in providing grant amounts and mandating the construction cost updates.

13

The question before us is the interpretation of subdivision (b) of each statute. For purposes of this case, more specifically, does subdivision (b) create a "ministerial duty" that the Board must perform and carry out, or a discretionary function, in the context of an application that was approved when no money was available to apportion?

"In essence, '[m]andamus lies to compel the performance of a clear, present, and ministerial duty where the petitioner has a beneficial right to performance of that duty.' [Citation.] 'A duty is ministerial when it is the doing of a thing unqualifiedly required.'" (*Galzinski v. Somers* (2016) 2 Cal.App.5th 1164, 1170.)

To determine whether the respective subdivision (b) provisions create a ministerial duty, we must begin with the statute's intent. (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health* (2011) 197 Cal.App.4th 693, 701.) We do so using the typical rules of statutory interpretation. "'We begin by examining the statutory language, giving the words their usual and ordinary meaning.' [Citation.] If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs." (*Estate of Griswold* (2001) 25 Cal.4th 904, 910-911.)

The plain language of subdivision (b) of both statutes states that the Board shall annually adjust the per-pupil grant amounts for inflation "set forth in the statewide cost index for class B construction as determined by the board." (§§ 17072.10, subd. (b), 17074.10, subd. (b).) Plaintiffs argue, therefore, that the Board had a ministerial duty to apply the same inflation factor to apportionments made long after the placement of a project on the Unfunded List. We cannot agree. Neither statute contemplates the existence of long-term unfunded projects, much less addresses how the Board must fund them.

Plaintiffs contend that such reasoning is backwards – that if the Legislature had intended an "exception" to the inflation adjustments, it would have included such

14

language in the statute. Again, we disagree. Subdivision (b) of sections 17072.10 and 17074.10 simply do not contemplate the situation in which the Board found itself. While other statutes in the Act address available funding (see, e.g., §§ 17074.15, 17074.16), it does not appear that any of them contemplated the multiple year-long delays between approval and apportionment. That delay, of course, was caused by the lack of available bond authority and funds.

Further, we agree with the Board that subdivision (b) of sections 17072.10 and 17074.10 cannot be read without reference to subdivision (a) of each section. Those sections do not establish grant amounts, but *maximum* grant amounts on a per-pupil basis, while subdivision (b) provides for inflation adjustments. The Board, then, adopts regulations, determines eligibility, and apportions funds. (§ 17070.35.) Reading the inflation adjustment provisions as relevant here as "ministerial" while the Board has broad discretion over the awards themselves makes little sense. Plaintiffs do not argue with the fundamental procedure the Board used here, including approving projects during periods without funds or the use of an Unfunded List. If the Board truly had no discretion over this process, such procedures, which were only permitted under the Board's regulations, must also surely fall by the wayside.

Indeed, one might begin to wonder, if the apportionment procedure was purely ministerial, why the Board is needed at all. Surely employees of, say, the Office, with their expertise, could process and approve applications. We disagree this is what the Legislature intended. Plaintiffs' argument that the Board's exercise of discretion could lead to "arbitrary and anomalous results" is true of any exercise of discretion by any agency, which is why judicial review exists.

In sum, we find no error in the court's interpretation of subdivision (b) of sections 17072.10 and 17074.10. Those provisions simply do not apply to the factual circumstances present in this case.

15

*Validity of Regulation 1859.107*

Plaintiffs also contend Regulation 1859.107 is invalid. That regulation states, in relevant part: "A funding application . . . that has received an approval . . . but has not received an apportionment, *may* receive an adjustment as allowed under [Regulations] 1859.71 . . . or 1859.78 at the time the apportionment is made." (2 C.C.R., § 1859.107, italics added.) Regulation 1859.71 addresses new construction grants, and Regulation 1859.78 addresses modernization grants, the types of grants at issue here. Those regulations state that the per-pupil grant amounts "will be adjusted annually," essentially restating subdivision (b) of sections 17072.10 and 17074.10. To put it another way, Regulation 1859.107 states that an approved but as-yet unfunded application "may" receive an inflation adjustment at the time it is funded. It is the "may" that plaintiffs take issue with.

Regulations promulgated by agencies are presumed valid. (*Association of California Ins. Companies v. Jones* (2017) 2 Cal.5th 376, 389-390.) To be valid, a regulation must meet two requirements: First, it must be within the power delegated by the Legislature. Second, it must be reasonably necessary to implement the statute. (*Id.* at p. 397; see Gov. Code, § 11342.2.) Even under the least deferential standard of review, we find the regulation valid. (See *Jones*, at pp. 389-390.)

Section 17070.35, subdivision (a)(1), directed the Board to "[a]dopt rules and regulations . . . for the administration of [the Act]." Similar language has been construed as a "broad" legislative delegation to promulgate a regulatory scheme. (*Association of California Ins. Companies v. Jones*, *supra*, 2 Cal.5th at pp. 391-392.) We find the Legislature granted the power to the Board to adopt regulations such as Regulation 1859.107. Because we have already explained that we disagree with plaintiffs' contentions regarding sections 17072.10 and 17074.10, we need not discuss their argument that this regulation conflicts with the statutes. It does not.

16

As to whether the regulation was reasonable necessary to implement the Act, we find it was. The regulation has a rational basis and is fundamentally reasonable. The Act's language does not provide instruction to the Board as to the handling of applications during periods without available funds or bond authority. Regulations such as this one permitted the creation of the Unfunded List, which kept the process moving during such periods, until 2012, when the Board adopted a different procedure. Thus, we conclude the regulation was reasonably necessary and had a reasonable and rational basis.

To the extent plaintiffs contend Regulation 1859.107, if valid, was misinterpreted by the Board, we disagree. The plain language of the statute addresses applications that are approved but not yet apportioned, which directly implicates projects on the Unfunded List. We reject any attempts to use extrinsic evidence to alter the meaning of the regulation's plain language.

*Abuse of Discretion and Remedy*

The trial court concluded that the Board had abused its discretion by omitting the inflation adjustments because its decision was arbitrary, capricious, and lacked evidentiary support. "[M]andate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner. However, it will lie to correct abuses of discretion." (*County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 654.) "In determining whether a public agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.] A court must ask whether the public agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, or whether the agency failed to follow the procedure and give the notices the law requires." (*Ibid.*)

17

The trial court found that plaintiffs "have presented evidence that for other applications the [Board] has included intervening construction costs index adjustments in later apportionments and evidence that the [Board] has, at least sometimes, required such adjustments to be included in later apportionments." The Board, however, had not cited to any evidence or offered any explanation for its decision regarding the relevant apportionments. Because of this lack of evidence, the court had no basis from which to conclude that the Board considered all relevant factors and that the choices it made had evidentiary support, which constituted an abuse of discretion.

The Board relies on the set of documents known as exhibit 38, at page 496. Exhibit 38 is a compendium of documents compiled in 2018 which set forth the Board's past deliberations and decisions on the issue of inflation adjustments for Unfunded List projects. The Board claims this document is sufficient to explain its decision for the projects at issue here. But this did not answer the trial court's concerns. Plaintiffs had presented evidence that in some cases, inflation adjustments had been included in later apportionments, but there was no explanation as to why they were not in the apportionments at issue. A compendium of 500 pages, without citations to relevant discussions or decisions, is not a substitute for evidence about particular decisions. Accordingly, under the substantial evidence standard, we find the court could reasonably have concluded the Board abused its discretion.

The place where we must part company with the trial court, however, is the court's decision to remedy the abuse of discretion by ordering the Board to apply the inflation adjustments to the plaintiffs' applications without further review. Doing so violated the first rule of judicial review of agency decision-making – substituting the court's own judgment for that of the agency. (*County of Los Angeles v. City of Los Angeles*, *supra*, 214 Cal.App.4th at p. 654.) "Traditional mandamus may be used to compel an agency to exercise its discretion but not to control it, i.e., to force the exercise

of discretion in a particular manner or to reach a particular result." (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1268-1269.)

The Board's error here, as articulated by the trial court, was its failure to specify the basis for its decisions regarding the inflation adjustments in plaintiffs' apportionments. This is the type of failure that can and should be remedied by the Board itself, rather than the court deciding how to allocate the funds. The court had the inherent power, given the facts of this case, to remand to the Board prior to entering a final judgment. (*Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 527.) Given that it was still possible for the Board to hold a hearing and remedy the problem the court identified, allowing the Board to exercise its discretion properly is far preferable to the court's decisionmaking on a matter specifically delegated by the Legislature to the Board. We therefore conclude that the matter should have been returned to the Board to exercise its discretion in accordance with the relevant statutes and regulations.

Finally, we note that this was not a decision reached easily or lightly. There are few matters more important to the long-term well-being of the state than public education. There are no villains here – none of the parties to this dispute are acting in bad faith or against the public interest. The Board's job is to fund as many qualified projects as possible from a finite pot of money. The school districts' job is to build and modernize their facilities in service of their mission to educate children. All parties here are victims of what could most charitably be called a "flawed" school construction and modernization funding system which inevitably leads to zero-sum decisionmaking. That system is both unfortunate and unfair, and perhaps it is time for the people of this state to reconsider it.

19

### III

### DISPOSITION

On the appeal, the court's judgment issuing the peremptory writ is reversed and the writ is vacated for the reasons stated above. On remand, the matter shall return to the Board for further proceedings consistent with this opinion. On the cross-appeal, the court's ruling is affirmed. In the interests of justice, each side will bear its own costs on appeal.

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

GOETHALS, J.

20